# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT

## JANUARY TERM, 1879.

JOHN W. GREENWOOD AND ELIZA SMITH, APPEL-
LANTS, *v.* MARY CLINE AND OLIVE NEWSOM,
RESPONDENTS.

WILL—UNDUE INFLUENCE—PRESUMPTIONS.—Where a will is shown to have
been duly executed, the law presumes competency in the testator, and
that it contains his unrestrained wishes in the disposition of his property;
but these presumptions may be disputed.

IDEM.— WHAT PROOF SUFFICIENT TO SET WILL ASIDE. — What consti-
tutes fraud and undue influence are questions that must depend on the
circumstances of the case. They are in their nature inquiries which can
not be referred to any general rule. Where an arbitrary and unjust will
is made in favor of one occupying a relation of confidence towards the
testator, and who might have influenced his mind, slight evidence that
he did exercise his power may suffice to invalidate the will. It is the
duty of one occupying such a relation to disabuse the testator's mind of
any false impressions he may have concerning others entitled to his
bounty, and the omission to do so may afford ground for imputing to him
undue influence.

IDEM—CIRCUMSTANCES INDICATING UNDUE INFLUENCE.—Where the estate
was large and was bestowed upon one daughter to the exclusion of other
children having equal claims upon the testator's bounty, the favored
daughter was alone present when the will was executed, and the trans-
action was kept a secret from the other children; the testatrix sustained
relations of confidence towards the beneficiary under the will, and during
such relation became imbued with groundless suspicion and aversion to-
wards a son with whom she had formerly lived, and whom she had mis-
led; while in her last sickness she made large donations to the legatee in
money, and one day before her death executed a power in favor of the
legatee's attorney to cancel a mortgage which she held against the legatee;
these transactions and the approaching death of the testatrix were kept
secret from the other children: *Held,* that these circumstances were in-
dicative of fraud and undue influence.

2

IDEM. — UNUSUAL CLAUSES AND PRECAUTIONS. — Where the will recited that the testatrix was "not under any restraint or the influence or representations of any person," and the certificates of two physicians were procured to the effect that the testatrix was of "sound mind and perfectly competent to make a will"—the excluded heirs having no knowledge that a will was to be made, and never having shown any interest in the distribution of the estate: *Held*, that such recital and certificates indicated a consciousness of suspicion that is inconsistent with honest motives, and lead to a suspicion against the integrity of the will.

IDEM—SPIRITUAL COMMUNICATIONS.—Where the testatrix, prior to the execution of the will, accompanied the legatee, a daughter, to a spiritua-seance at the house of the legatee's attorney, where a pretended letter was read from the deceased husband of the testatrix, warning her against her son, and advising her to "fix" her property so that he should not get it: *Held*, that these facts were evidence of an attempt to unduly influence the testatrix in the disposition of her property by will, and went to impeach the will.

APPEAL from Clackamas County. The facts are stated in the opinion.

*Thayer & Williams, J. A. Stratton and Wm. H. Holmes,* for appellant.

*Mallory & Shaw, and G. W. Lawson,* for respondents.

By the Court, PRIM, J.:

This suit was brought in the county court of Marion county, to set aside a will made by Mrs. Elizabeth Greenwood, on the ground that she was of unsound mind when the will was executed, and that it was procured through fraud and undue influence of the respondents, Mary C. Cline and her daughter, Mrs. Olive Newsom. The will was executed on the twelfth day of October, 1872, and the testatrix died on August 9, 1875. She was sixty-two years of age at the date of the will, and sixty-four when she died. At the time the will was made she had three children living: Mrs. Cline, the eldest, about forty-four years of age; Mrs. Eliza Smith, thirty-seven years of age; and John W. Greenwood, the youngest of the family living, about thirty-five years of age. The will bequeathed to Eliza and William, the appellants, one hundred dollars each, and to Olive Newsom, the granddaughter of the testatrix, eighty acres of

land, and the residue of the estate to Mrs. Mary Cline. The whole estate was worth, at that time, about twenty-six thousand dollars. Shortly after the death of the testatrix the will was duly admitted to probate, in common form, and the executors having duly qualified proceeded to administer upon said estate, and thereafter, in August, 1876, made their report for final settlement, after giving the usual notice required by law. Thereupon appellants filed their petition, setting forth that said testatrix at the time of making her said will was not of sound mind. That in consequence of old age and other causes her mind was seriously impaired and shattered, her memory destroyed, and that she was incapable of exercising any judgment whatever. That her mental condition was such that she was easily persuaded in her course of conduct; and that her attempt to make and execute the will and dispose of her estate in the manner therein provided, was the result of undue influence exercised upon her by the said Mary Cline and Olive Newsom, or other parties acting for them or in their interest, and that the same was not in fact the will of said Elizabeth J. Greenwood. Respondents joined issue, denying all the above charges, and affirming the capacity and competency of the testatrix. All the testimony except two depositions having been taken orally before the county court and reported in short-hand, the cause was submitted and decided in favor of the contestants—that court holding that notwithstanding the testatrix had testamentary capacity, the will was executed under undue influence. The cause was then appealed to the circuit court. Upon a hearing before that court the judgment of the county court was reversed. Whereupon the contestants have appealed to this court.

In examining the testimony bearing upon the mental condition of the testatrix during the last years of her life, embracing the time at which the will was executed, it appears that in 1866 the testatrix had a severe attack of paralysis, from the effects of which she never fully recovered. That her memory became defective; that she could not tell who was working for her; that she would lease a piece of land one day and the next day could not remember it, and would

ask the same questions over repeatedly at short intervals. Mr. Redfield, in his valuable work on wills, pp. 94 and 95, in speaking of this subject, says: "The loss of memory is one of the earliest and surest indications of the approach of mental infirmity."

Dr. Cusio, a witness, says that sometimes the testatrix was very despondent, and in many respects different from the majority of people; that at times there was some degree of mental obliquity. Dr. Peyton, a witness, who met her frequently while attending upon her late husband and her youngest son in their last sickness, says: "Her condition seemed to be that of impaired mental powers." He also states that her husband directed his attention to the fact that her mind was not what it had been. Sarah Buxton, another witness, says of her: "Her eyes had a dead expression, and her manner was sometimes like that of an intoxicated person." J. M. Hagey, a witness, says that "he noticed her acting very peculiar" in her conversations; that she would stop before she had completed the remarks she was making, and "never resume the subject or refer to it again." He noticed this peculiarity about 1872. Hardin McAllister, a witness, described her as absent-minded. He noticed her on one occasion, after she was attacked by paralysis, that while lying in bed she would imitate the actions of a person examining and breaking something in pieces which she held in her hand, pretending that she had a piece of quartz, which she was breaking up and examining for gold. This witness also testifies as to her disposition to yield her opinion to those with whom she talked. He says she was in the habit of talking a great deal about stock; and if she thought a great deal of a certain horse, and you would say another horse was a finer one, she would side with you, and conclude that it was a finer horse. A witness, Caleb Chapman, testifies that on one occasion, while the testatrix was going from Salem to Howell's Prairie alone, she became turned around in the road, and was coming back to Salem without knowing it when he met her. Another witness, Mary Sappingfield, describes her as appearing to be "in a kind of worry." Wilmot Scott, a witness, who

had lived at Cline's awhile, and afterwards stayed with the testatrix, says that the winter he was there she didn't appear to ever laugh or be cheerful; that she did not pay any attention to "her housework or anything that was going on." She told witness it "was from the effect of her head; that her head was hurt from the effect of a buggy running down hill with her." This witness also testifies that she said: "They all told her that she (the testatrix) was not right." Delos Jefferson, another witness, testifies that about the year 1870 Mrs. Cline, the principal beneficiary under the will, told him that her mother's mind was not quite clear.

These are brief references to the testimony of such witnesses as were old neighbors and intimate acquaintances of the testatrix. Many of them are aged persons, and had been intimately acquainted with her for thirty years. Their opinions in relation to the mental condition of the testatrix are of paramount importance, because they are accompanied with a statement of the facts upon which they are founded. They have undertaken to relate the conduct, manners, bearing, conversation, appearance and acts of the testatrix, from which their impressions of her mental unsoundness were formed; and such opinions are entitled to more weight than the mere opinion of witnesses who do not give the facts upon which their opinions are based.

Mr. Redfield says that "testimony to establish partial or general insanity should come, as far as practicable, from those persons who have had extensive opportunity to observe the conduct, habits and mental peculiarities of the person whose mental peculiarities are brought in question, extending over a considerable length of time and reaching back to a period anterior to the date of the malady." (1 Red. on Wills, 136, 137.)

The respondents, to rebut the evidence heretofore tending to show the mental unsoundness of the testatrix, have introduced another class of witnesses, among whom are many of the leading business men of the city of Salem, who had had some acquaintance with the testatrix and occasional business transactions with her. They are men, not only of intelligence but of high standing and character, and

their evidence is entitled to consideration. Among them are Asa and David McCully, J. H. Alberts, A. W. Kinney, E. N. Cooke, Dr. Weatherford, and others. These gentlemen were acquainted with the testatrix—some of them for several years. They are men engaged in business in the city of Salem. She resided on a farm in Howell's Prairie, several miles away, and they met her occasionally when she came to town on business. In their opinion she was of sound mind and sufficient mental capacity, so far as they had observed, to transact her own business and understand ordinary business affairs.

The business transactions referred to by the witnesses were very plain transactions, which called for the exercise of neither judgment, foresight, prudence, information nor memory. The routine of drawing her dividends when due, on the P. T. company stock, was very simple. Her transactions with Mr. Alberts were of a similar nature. Mr. Kinney says: "She was very tedious to do business with; it took a good deal of time. I think her mind was sound, but she was quite an old lady and was in quite poor health."

It will be unnecessary to notice this branch of the evidence any farther, as it was conceded in the argument that the testatrix had sufficient mental capacity to make a will if allowed to exercise her own unbiased judgment, free from undue influence. But it was claimed that the testatrix was old and in feeble health; that her mind was weak and impaired to such an extent that she was infirm of purpose and easily persuaded and influenced in her conduct by any one possessing her confidence.

Dr. Francis Willis, a person of great name as connected with mental disorder, defines the difference between an unsound mind and a weak one as follows: "A sound mind is one wholly free from delusion. Weak minds only differ from strong ones in the extent and power of their faculties. An unsound mind is marked, on the contrary, by delusion, by an apparent insensibility to or perversion of those feelings which are peculiarly characteristic of our nature." (1 Redfield on Wills, 78 and 79.)

On May 23, 1869, William Greenwood, Sr., the husband

of the testatrix, died possessed of a considerable estate, which was equally divided between his children. They were three in number: Mrs. Mary Cline, the eldest, Mrs. Eliza Smith, and John W. Greenwood, the youngest of the three. They were grown at that time, and each of them had a family. The will, as has already been stated, was executed after this, on the twelfth day of October, 1872. At that time Mrs. Cline had a husband, and was in business, but not in affluent circumstances. Her daughter Olive was married to John Newsom, a man in prosperous circumstances. Mrs. Smith had a large family of children, seven in all; several of whom were small. At that time she was in reduced circumstances, her husband having been broken up a short time before. The testatrix knew their circumstances. They were then keeping boarders for a living and residing in Umatilla county. Eight months after the execution of the will the husband of Mrs. Smith died. John W. Greenwood was a thrifty farmer and a married man, his wife being the sister of John Newsom, the son-in-law of Mrs. Cline. The three children had shared equally in their father's estate, Mrs. Cline's portion being represented by the half of a lot and brick building in Salem—at that time having bought the other half, she owned the entire property, and was in receipt of an income from it.

At the time the will was executed the estate of the testatrix was quite large, amounting to twenty-six thousand dollars.

The testatrix and her son William were co-administrators upon the estate of William Greenwood, which was settled up about the year 1870.

In the years 1869–1870 John W. managed the farm of his mother, and the profits of her share in the crops for those years amounted to five thousand dollars. In 1871–72 Mrs. Greenwood managed the farm herself. After the death of the husband of the testatrix, Mrs. Cline and her husband resided in Salem for several years, she being engaged in the millinery business. About 1870 she moved to Kalama, where she resided until about August, 1873, at which time she moved upon the farm of the testatrix, and resided with

her until her death. Prior to the execution of the will the testatrix wrote to Mrs. Cline to meet her in Salem, that she wished to see her on important business; but without, as Mrs. Cline states, disclosing the nature of the business. Mrs. Cline came to Salem as requested, when she met her mother, and was present at the execution of the will. The circumstances attending the transaction will be presently referred to.

Dr. Richardson testifies that Mrs. Greenwood came to his office in company with Dr. McCurdy on the twelfth of October, 1872, and that they examined her with reference to her sanity, and gave her a certificate to the effect that she was of sound mind, and competent to make a will. He remembered but little of what occurred — recognized his signature to the certificate, and this was about all he knew of the transaction. The examination of the testatrix was very short, and he could not remember the questions asked her. He remembers that she gave as a reason for making the will as she proposed, that the other children had already had more than their proportion of the property.

Mrs. Smith testifies that her mother was a little hard to get along with at times, but was always good to her; that she never saw her but once after they moved to Umatilla, and that was when she, the witness, came down to get her child doctored; that her mother was stopping at Mrs. Cline's at that time, on the place that had formerly been given to her brother William; that the witness stopped at her brother William's during that visit, and her mother came there to see her; that the last time she saw her mother was at Chappel's, on her father's old place, the day before she returned to Umatilla; that she told her mother that she was going to leave next day, and never expected to be there again; and her mother said she would get in the hack next day and go to Salem with her; but when the hack came along she was not in it, and witness never learned why she did not come; that while her mother was living with her on the place Mrs. Cline tried to persuade her to go to Salem and live with her, and on one occasion went out in the Silverton stage to her mother's place, and told her mother that their father's

spirit rode out with her, and talked with her, and wanted her mother to move to Salem and live with her, Mrs. Cline.

William J. Greenwood lived with his parents until a short time after he was married, when he went upon a piece of land, a part of his mother's donation claim. After his father's death he lived with his mother, and took charge of her affairs until 1870; Mrs. Cline was living in Salem then; William testifies that every time his mother came to town she would get the idea that a final settlement of his father's estate could be made in six months, and it would take him some time to convince her that it could not be done; that she would be all right then until she would make another visit to Salem; that she always visited Mrs. Cline when she came to town. After William was married he talked of moving east of the mountains, but his father and mother were opposed to his doing so, and told him if he would settle on the eighty-acre tract on the prairie they would give it to him; it was unimproved. He went upon this land and improved it, and remained there until 1872, when his mother came to him and told him she wanted it back again. He told her she could have it back if she wanted it. He had fenced it and set out an orchard. He told her he wanted five hundred dollars for the improvements; she said that was too much. The land was worth at that time about four thousand dollars. He also testifies to the same circumstance spoken of by Mrs. Smith in reference to Mrs. Cline going out to the place and telling his mother that her father's spirit rode out with her in the stage, and wanted their mother to go to Salem and live with Mrs. Cline; that his mother appeared serious over the matter; that she and Mrs. Cline went off together; that every time his mother went to Salem Mrs. Cline would try and get her to come and live with her.

While it is conceded by the contestants that the testatrix had sufficient mental capacity to make the will if allowed to exercise her own judgment, free from all improper interference, they claim that it appears from the evidence that she was old and feeble; that her mind was weak, and impaired to such an extent that she was easily persuaded and in-

fluenced in her conduct by any one possessing her confidence. And that the attempt to execute the will in question and distribute the property as therein provided was entirely the result of undue influence exercised upon her by her daughter, Mrs. Cline, and her granddaughter, Mrs. Newsom, the beneficiaries of the will, and other parties acting in their interest.

When a will is shown to have been duly executed, the law presumes competency in the testator, and that it contains his unconstrained wishes in regard to the disposition of his property. But this presumption may be rebutted by showing that it was obtained by fraud and imposition practiced on the testator, or undue influence.

" What constitutes undue influence is a question which must depend very much on the circumstances of each case. It is in its nature one of those inquiries which can not be referred to any general rule." (11 Harris, 375; 2 Leading Cases in Eq., 1271.)

While "it is always allowable to employ argument, persuasion or even importunity to induce one to do that from which no rule of law or morals bids him to refrain;" yet "if where a legatee obtains a preference by a false statement concerning one who has a legal or paramount claim on the testator's bounty, there is a palpable fraud which avoids the bequest." (2 Leading Cases in Eq., 1273.)

It is laid down by the author of the Notes in Leading Cases in Equity that " the weight of authority accordingly is that although the mere existence of a confidential relation does not shift the burden of proof; yet where the will is one which the testator could not make consistently with the claims of duty and affection, and therefore, presumably would not have made if he had been left to the dictates of his own judgment, the bequest should be pronounced invalid, unless some evidence is adduced which overcomes the unfavorable influence arising on the face of the transaction." (2 Leading Cases in Eq., 1275; *Meek* v. *Perry*, 36 Miss. 196; *Harvey* v. *Sullens*, 46 Mo. 146; *Brand* v. *Pratt*, 18 Pick; *Morris* v. *Stokes*, 21 Ga. 552; 16 Vermont, 335; *Tyler* v. *Gardner*, 35 N. Y. 554, 559.)

While the above doctrine may be a little too strong we think "it is clear that where an arbitrary and unjust will is made in favor of one occupying a relation of special confidence who might have influenced the testator's mind, slight evidence that he did exercise his power may suffice to invalidate the will." (*Coleman* v. *Robertson*, 18 Ala. 84; *Harvey* v. *Sullins*, 46 Mo. 147; *Harrell* v. *Harrell*, 1 Duvall, 203; *Patterson* v. *Patterson*, 6 Ar. R. 53; *Tyler* v. *Gardner*, 35 N. Y. 559.)

It is said that "fraud and undue influence are not ordinarily susceptible of direct proof, and in a majority of cases can only be inferred from the nature of the transaction or from the relations of the parties to each other. In *Marsh* v. *Tyrrel*, Sir John Nicholl said: "The ground for imputing it must be looked for in the conduct of the parties and in the documents rather than in oral evidence. The necessary inferences to be drawn from that conduct will afford a solid and safe basis for the judgment of the court."

In New York "the fact that the donor was brought before the execution of the instrument to a state of causeless alarm as to the condition of his property, and groundless suspicion against the members of his family, was held to be a circumstance indicative of undue influence."

It becomes necessary to look into the documents, the relation of the parties to each other, and the circumstances surrounding the whole transaction, in order to ascertain whether there exists any grounds for imputing fraud and undue influence in the execution of the will.

The testatrix was an old woman in feeble health, with a mind weak and impaired to such an extent that she was easily persuaded and influenced by those possessing her confidence. She had a large property, amounting in value to twenty-six thousand dollars, all of which she bequeathed to her daughter, Mary Cline, and to her granddaughter, the daughter of Mrs. Cline, except two hundred dollars, which she gave to the other two children, to keep them "from breaking the will." After the death of her husband she and her son William were co-administrators upon his estate, which was duly settled up according to law. For two years

after the death of her husband William superintended and managed her farm and business for her, and the crops of those two years brought five thousand dollars. Up to the time that she commenced to reside with the Newsoms and Clines she was on good terms with William and her daughter Eliza. After that she became distrustful of them, and especially of William. Prior to and at the time the will was executed she resided with John Newsom, the son-in-law of Mrs. Cline, and from about the time the will was executed up to her death, with Mrs. Cline. Between these two families on one side and William and Eliza on the other there was bitter enmity.

At the time of the execution of the will the relation between the testatrix and Mrs. Cline was one of unusual confidence. Prior to the execution of the will the testatrix had visited Mrs. Cline twice at Kalama, in Washington Territory, remaining one time two or three weeks and the other five or six weeks. And from all the evidence bearing upon this point we infer that the will was executed shortly after this last visit.

According to the testimony of Mrs. Cline she was sent for to Kalama, in order that she alone of all the children should be present when the will was executed. William had been expelled from the eighty-acre tract of land given him by the testatrix when a boy, for no assigned cause except that she wanted it herself, and she had let Mrs. Cline have it free from rent. She loaned Mrs. Cline three thousand dollars in money, keeping the transaction a secret from the other children and neighbors, which loan became in effect a gift. And yet about this time she was heard by some of the witnesses to express fears of coming to want, and said she was " as poor as she could be." The will itself is not only an unusual one as to the distribution made of the property of the testatrix, but unusual and extraordinary as to some of its recitals, one of which is as follows: " I, Elizabeth Greenwood, being of sound and disposing mind, and not under any restraint or the influence or representation of any person whatever," etc.

The procuring of the certificates of two physicians at-

tached to the will to the effect that they have examined the testatrix and find her in all respects in good health and of sound mind, and "perfectly competent to make her will," is an unusual circumstance in the execution of such an instrument. In Twine's case (Abridgment of Coke's Rep. 62) it was held that a clause in a deed that it was made honestly, truly, and *bona fide,* was an unusual clause, which lead to a suspicion against the integrity of the instrument.

In *Taylor* v. *Taylor,* 8 Howard 183, the court took a similar view of such a clause in a deed, holding that such an unusual clause indicated an "apprehension or consciousness of suspicion" that is inconsistent with honest motives, and that "suspicions and surmises" on the part of those participating in the transaction were the offspring of cold calculation and of the compunctious visitings that wait on contemplated wrong. In this case the transactions between Mrs. Cline and the testatrix are not only unusual in many respects, indicating "apprehension" and a "consciousness of suspicion," but such apprehensions are repeatedly avowed.

Neither William nor Eliza knew that a will would be made. Neither had shown any disposition to control the testatrix in the disposition of her property; and yet it appears that the "apprehensions" were so great that doctors were hired to certify that the testatrix was "perfectly competent to make her will;" and under this apprehension two thousand dollars were obtained from the testatrix, and an attempt was made to obtain four thousand dollars more, to be used in "fighting for the will."

According to Mrs. Cline's testimony she made a two days journey here from Kalama, at the request of the testatrix, to be present at the execution of the will. But when she met her mother on the street in Salem, and was informed that she was going to make a will and desired her to accompany her to the office of Judge Terry for the purpose of having it drawn, she refused to go with her, and assigned as a reason that it would not look altogether right. She states that at this time she had not been informed by her mother how she intended to make her will. At this point it ap-

pears the question was raised as to whether it would be prudent to get Lawson to draw the will on account of the report that he was crazy, and of the probable effect such report might have on the will if contested. If Mrs. Cline did not know that the will was to be made in her favor, and that the other children would be excluded, why should she conclude that it would not "look altogether right" for her to be present? According to her story, up to that time she had never said a word to her mother upon the subject, and yet she felt a conciousness in her own breast that it would not look well for her to be present. After some hesitation she finally consented, however, to accompany the testatrix, and be present when the will was executed. When they were about half way up the stairway leading to Terry's office her mother told her how she intended to make her will, and here another discussion occurred between them as to how much should be given to Eliza and William to keep them from " breaking the will." The testatrix only wanted to give them five dollars each, while Mrs. Cline thought they ought to have more. She thought a hundred dollars would be " a mere nothing" out of such a large estate as her mother's. She pleaded earnestly that they should have more than her mother proposed to give them, but the testatrix was firm, and could not be induced to give another cent beyond one hundred dollars to each. It will be observed, however, that this remonstrance and earnest plea in behalf of William and Eliza were not made upon the ground of the injustice done to them; but upon the ground that it was too small a sum to prevent them from making a successful fight against the will. She said to her mother that she wanted her "to fix it in a way that we will not have trouble "—that she knew her "brother's turn." To which her mother replied that she would do her business up in such a manner that it could not be broken; that her dealings should be with the "very best and most influential persons of Salem, whose characters were entirely above suspicion, and whose oaths would be of great weight, and far above anything William could bring into court to upset it," but that if she was afraid she would give her means to fight with, as the sequel shows she did.

As to the next occurrence there is a material conflict be-
tween the evidence of Mrs. Cline and that of David
McCully.   She states that after her mother had a talk with
Cooke and the McCullys in relation to her will, she and
her mother went immediately to Terry's office, and that the
will was drawn up under her mother's personal instructions;
while McCully states that he met the testatrix in the street
near Bush's bank, and after obtaining the consent of him-
self and his brother to act as her executors, he and the tes-
tatrix proceeded alone to the office of Terry, where she was
going to sign her will, and that while on the way she in-
formed him how she was going to make her will, and the
reason why she was going to do so.   This occurred not to
exceed five or ten minutes prior to the signing of the will.
When they arrived at Terry's Mrs. Cline was there, and the
will was already drawn up and ready for the signature of
the testatrix.   The inference to be drawn from this evidence
is that Mrs. Cline went to the office of Terry and had the
will drawn before her mother arrived there.   If this is not
the correct inference why has Terry not been called to ex-
plain this matter?   Mrs. Greenwood is in her grave, and
Terry is the only disinterested witness in existence who
knows what occurred there.   McCully is a man of high
standing, and the truth of his statement can not be ques-
tioned.

While the Clines and Newsoms claim that they never did
or said anything to influence the testatrix to make a will in
their favor, John Newsom admits that she advised with
him in relation to the matter; that she wanted to know what
he would do if he were in her place.   He says he told her
that if she wanted to make any special disposition of her
property it would be necessary to make a will.   Mrs New-
som admits that she had two conversations with her about
the matter.   She heard the testatrix say that she did not in-
tend to give William and Mrs. Smith any more than enough
to prevent them from breaking the will; that when Mrs.
Smith went away she had given her all she ever intended
her to have; that she had already received considerable;
and that William had received more than his share from his

father's estate in settling it up. One of those conversations occurred in June, 1872, and the other about October 1, of the same year, only a few days before the will was executed. But the evidence goes further and shows an attempt to influence the mind of the testatrix by "means of pretended spiritualism."

After the death of the testatrix's husband Mrs. Cline was very solicitous to have her mother go to Salem and live with her, but the testatrix was not disposed to comply with her wishes in that respect. On one occasion Mrs. Cline went out to visit her mother and told her that her father's spirit had ridden out with her in the stage, and that he was very anxious that she should move to Salem and live with her. About this time it also appears that the testatrix was in the habit of attending spiritual seances in company with the Clines at the house of Mr. Lawson, who had been the attorney of Mrs. Cline during and since the settlement of her father's estate. Mrs. Cline, Lawson and his wife were avowed spiritualists. Mrs. Lawson claimed to be a spiritual medium, and on one occasion when the testatrix was present, a pretended letter was produced, purporting to come from the deceased husband, "Uncle Billy Greenwood," as the witness called him. This letter undertook to advise the testatrix about matters in this world in regard to her son William. It said that Mr. Greenwood, in looking back into the world, "thought William was rather a rough character and liable to squander her property; that she ought get it all out of his hands if she could and place it in such 'condition or fix' that he could not get hold of it." George Roland, a witness, says Lawson exhibited this letter to him the next day, and read it to him, and wanted to know if it did not sound like "Uncle Billy Greenwood talked." Witness replied that it did sound like "Uncle Billy."

This witness says Mrs. Greenwood appeared rather nervous over the matter, and was anxious to have a manifestation from Mr. Greenwood. He also says that he saw the testatrix and the Clines there on several different occasions, and that there was always some manifestation from Mr. Greenwood. The witness says he met Mrs. Greenwood

going there on another occasion on which she told him that Mrs. Lawson was going to "develop some more for her."

Mrs. Cline admits that she and her mother were at Lawsons on one occasion when a communication was received purporting to come from her deceased father, but pretends that she did not know what it was; that she gave but little attention to the matter. She claims, however, that it produced no impression upon her mother except that of disgust; that she looked upon Mrs. Lawson as a humbug, and Mr. Lawson as too smart a man to be so easily duped.

We are left in doubt by the testimony as to whether the testatrix became a believer in the doctrine of spiritualism or not. Some of the witnesses say that she did, while others claim that she did not. The question therefore does not arise in this case whether the will of a spiritualist can be maintained where it appears to be the "direct and obvious offspring of spiritual communications and influences."

This transaction does show, however, that there was an evident attempt by means of these pretended spiritual communications to produce an improper impression upon the mind of the testatrix, in regard to her son William, the object of which was to impress upon her mind that William was a bad character; that he was not only faithless but dishonest, and would squander her property upon lewd women and in saloons if she did not place it in such "condition or fix" that he could not get hold of it. In consequence of this impression, about this time or shortly thereafter, we find her taking away from him the land she had given him when a boy, with the understanding at the time that it was to be his; and upon which he had made valuable improvements and held for seventeen years. This was given to Mrs. Cline free from rent.

It further appears that prior to the execution of the will the testatrix had loaned Mrs. Cline three thousand dollars, and took an assignment of a mortgage on the brick building in Salem, belonging to Mrs. Cline as security. The will was executed on the twelfth day of October 1872, and on the twenty-fifth day of the same month, only thirteen days afterwards, Mrs. Cline and husband executed a deed to the

testatrix for this lot and building in consideration of three thousand dollars as expenses in the deed. And on the thirty-first day of the same month, in consideration of three thousand dollars, the testatrix conveyed the same property back to them. Both of these deeds were filed for record on the same day. This mortgage remained on the records uncanceled, in the name of the testatrix, up to within a day of her death, although paid off by the pretended life lease upon the premises as claimed by the Clines. According to their story this lease was executed about three years prior to the death of the testatrix, and not long after the loan of the three thousand dollars. Although it was claimed by the Clines to be in writing it was not produced at the trial, and no such paper appears on record, and its existence depends entirely upon the oral evidence of the Clines.

According to their evidence the testatrix was sick five or six months prior to her death, and they were expecting her to die two or three months before she did, and yet this mortgage was allowed to remain on the records uncanceled until the day before she died. A few days prior to her death Cline procured Lawson, the attorney of Mrs. Cline and on intimate terms with her, growing out of spiritualism, to draw a power of attorney, to be signed by the testatrix, authorizing him as her attorney in fact to cancel the mortgage, which was signed by her on her death-bed, only one day prior to her death. Now if the testatrix had agreed to accept this lease in payment and satisfaction of the amount due on the mortgage, why was it allowed to remain uncanceled until the testatrix was breathing her last? It is inconsistent with this theory, that Cline collected the rents notwithstanding the property had been leased for two or three years to the testatrix. It further appears that a few months prior to the death of the testatrix, Cline drew two thousand dollars of her money out of the bank, and afterwards tried to draw four thousand dollars more which the cashier of the bank refused to let him have on the ground that it was not due; but so great was the anxiety to obtain it that an offer was made to discount the interest. Cline swears that the testatrix delivered the two thousand dollars to Mrs. Cline to be

used by her in fighting to sustain the will.   This donation
was secured during the last sickness of the testatrix, and the
attempt to secure the other four thousand dollars was made
still later and while she was on her death-bed.   The trans-
action occurred when no one was present but Mrs. Cline
and her husband.   It looks fraudulent upon its face, and is
strong evidence of undue influence.   It not only shows that
the Clines exercised absolute dominion over the testatrix,
but an anxiety on their part to get hold of her money while
she was yet alive, that could result only from an apprehen-
sion that their scheme might be exposed and defeated.   All
of these transactions, as well as the execution of the will,
were kept a profound secret from William and Eliza who
were virtually excluded from the presence of the testatrix
during her last sickness.   Neither of them, it appears, were
informed by the Clines that she was seriously ill, although
they were expecting her to die two or three months before
she did.   Eliza was living in Umatilla county and heard
nothing of it until after she was dead.

As in *Tyler* v. *Gardner*, it appears that the will was made
under two false impressions, which go to the very root of
its provisions; one of which is that Mrs. Cline had not
received her portion of her father's estate, and the other
that her son William was faithless and dishonest, and had
received more than his proportion of that estate in settling
it up, and that, if she gave him any of her property, he
would squander it in saloons and in houses of prostitution.

These expressions in relation to William were nearly
always made in the presence of the Clines and Newsoms.
There is nothing in the testimony indicating that these
charges were true.   On the contrary, it appears that he is
not a spendthrift, but in affluent circumstances, and that
his property was acquired by his own industry; that he
managed his mother's business with success for two years,
gaining a profit to her of five thousand dollars.

The testimony of Dr. Richardson and the McCullys shows
that the testatrix was laboring under the impression that it
was necessary to make her will as she did in order to make

an equitable adjustment of the property between her children.

The evidence shows that this impression was not correct and Mrs. Cline knew it. The evidence fails to show that the testatrix had any such impression until after she took up her residence with the Newsoms and Clines. Mrs. Cline occupying a relation of special confidence towards the testatrix, equity and good conscience required her to disabuse her mind of such false impressions. But, instead thereof, we are led to infer, from the facts established in the case, that she and those acting in concert with her did everything they could to create these impressions. In fact, it appears from the testimony that she gave Mrs. Cline as an authority for them, for she replied to a witness that "Mary said so." The facts of this case and the relation of the parties, and circumstances surrounding the various transactions connected with the execution of the will, are very similar to those in the case of *Tyler* v. *Gardner* (35 N. Y. 559).

What the court said in that case is equally applicable in this case: "The studied privacy of the will, the constant presence and vigilance of the principal beneficiary, and her omission to advise the son and grandson of her approach to death, are familiar and marked *indicia* of the exercise of undue influence under circumstances like those developed by the evidence." *(Crispell* v. *Dubois,* 21 Barb. 397; *Delafield* v. *Parish,* 25 N. Y. 41.) "The will was made by the testatrix under two false impressions, which went to the very root of its provisions; one, that the daughter was poor, and the other, that her son was faithless and dishonest, and that he had purchased his farm with her money."

The court further said: "It is true that the burden of establishing impositions and undue influence rests, in the first instance, upon the party by whom it is alleged. Fraud is never to be presumed from the mere concurrence of temptation and opportunity, or from the mere fact that the chief actor is the principal beneficiary. It must be established by affirmative evidence. It is thus established, however, when the facts are proved from which it results as an unavoidable inference. When such evidence is furnished,

the burden of repelling the presumption to which it leads is cast upon the party to whom the fraud is imputed. It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity."

In the *Parish will case* the court, in commenting upon the circumstances raising a presumption of undue influence by the principal beneficiary, said: "Direct evidence of her control in these matters, of her actual exercise of undue influence in procuring her will to be executed by him, could hardly be expected. The means of keeping the influence out of sight were too many and too easy of application. But when such is the array of circumstances, when such a result is attained without any more substantial apparent cause, we are justified in saying, from the evidence, that the only cause to be inferred which is in the least degree adequate to produce the result, is a long-continued, persistent, overpowering influence, to which his condition rendered him peculiarly subject, and which she was as peculiarly in a position to exercise." (25 N. Y. 95.)

In the *Gardner will case*, the court, in summing up its conclusions, said: "In the present case all the controlling facts tend to one inevitable conclusion. When the antecedent and surrounding circumstances are grouped in their appropriate relations they carry to the conscience and the understanding the clear conviction, that when the mother affixed the signature she was executing her daughter's will. It is no sufficient answer to the presumption of undue influence, which results from the undisputed facts, that the testatrix was aware of the contents of the instrument and assented to all of its provisions. This was the precise purpose which the undue influence was employed to accomplish." (35 N. Y. 595.)

We adopt the above remarks of the court in that case as peculiarly applicable to this case. In this case, the facts from which fraud and undue influence may be inferred are

to be found not only in the will and the unusual circumstances attending its execution, but in the deeds which passed between Mrs. Cline and the testatrix; in the life lease and in the authority to cancel the mortgage against the property of the legatee; in the circumstances by which the two thousand dollars in money was obtained from the testatrix, and in the attempt to obtain four thousand dollars more remaining on deposit. In the unfounded "suspicions" and "apprehensions" with which the mind of the testatrix was filled respecting her son William and the safety of her property, and in the false impression under which she was laboring as to the supposed injustice that had been done Mrs. Cline in the distribution of her deceased husband's estate, and in the attempt to deceive the testatrix by means of pretended spiritual revelations. "The will, the deeds, the pretended lease, the power to cancel the mortgage, the drafts on the bank, were the different means for obtaining the property of the testatrix. They all had an object, and the relation between the parties were the same at the different dates of these transactions." Having thoroughly examined and considered the voluminous evidence produced in this case, we find that the testatrix had sufficient mental capacity to make a will if allowed to exercise her own judgment without any improper interference; but that she was old, in feeble health, and her mind weak and impaired to such an extent that she was easily persuaded and influenced in her conduct by any one possessing her special confidence, and that the will in question was the result of imposition and undue influence practiced upon her by the beneficiaries under it and others acting in their interest, and that it should be set aside and the property of the testatrix be distributed as the law directs where no will is made.

The judgment of the court below is reversed.