Argued at Pendleton October 26, affirmed December 22, 1925.

IN THE MATTER OF THE ESTATE OF C. J. ALLEN.

MARY E. GRAHAM ET AL. *v.* MARY E. ALLEN ET AL.

(241 Pac. 996.)

**Wills—Man must be of "Sound Mind" Free from Restraint to will Property—"Sane Mind."**

1. Under Section 10092, Or. L., a man must be of sound mind, free from restraint, to dispose of his property by will; "sound mind" being synonymous with sane mind.

**Wills—"Undue Influence" Sufficient to Avoid Will Defined.**

2. "Undue influence" sufficient to avoid a will is that which compels the testator to do that which is against his will, from fear, desire of peace, or some feeling that he is unable to resist, and must be such as to overcome his free volition or conscious judgment and substitute the wicked purposes of another instead, and be the efficient cause, without which the obnoxious disposition would not have been made.

**Wills—Testamentary Capacity Held Established Under Evidence.**

3. Evidence *held* to establish testamentary capacity, notwithstanding aged testator was shown to have a failing memory.

---

2. Undue influence invalidating will, see notes in 16 Am. Dec. 257; 31 Am. St. Rep. 670. See, also, 28 R. C. L. 137.
3. See 28 R. C. L. 94, 96.

Evidence—Family Physician Competent to Testify as to Testator's Sanity.

4. Testator's family physician, who attended him for several years prior to death, during which time will was made, *held* competent to testify as to testator's sanity.

Evidence—Witnesses Should not be Permitted to Testify as to Whether Testator was Capable of Making Will.

5. A testator's capacity to make a will or transact business is a conclusion which the law draws from certain facts as premises, and witnesses should not be permitted to say whether a given act was legal or illegal, or that testator had capacity to make a will or execute a deed.

Wills—Degree of Intelligence Required of Testator not Prescribed.

6. The exact measure or degree of intelligence which a testator shall possess is not prescribed by law, but he must be of sufficient sound mind and memory to enable him to know and understand the business in which he is engaged at time of execution of will.

Wills—Contestants have Burden of Proving Undue Influence.

7. The contestants of a will have burden of proving that it is result of undue influence brought to bear on testator.

Wills—Undue Influence Ground of Avoiding Will.

8. If will or any part of it is product of "undue influence," the whole will or such part is void, but undue influence must operate on mind of testator in very act of making will.

Wills — Undue Influence by Wife and Son Held not Established Under Evidence.

9. In contest by some of testator's children of will leaving entire estate to widow, except land deeded to two of sons, evidence *held* not to have established undue influence exerted by wife and sons sufficient to avoid will.

---

Evidence, 22 **C. J.**, p. 668, n. 73, p. 669, n. 85, 88, p. 714, n. 97.
Insane Persons, 32 **C. J.**, p. 620, n. 35, p. 621, n. 55, 56, 57.
Undue Influence, 39 **Cyc.**, p. 682, n. 10 New.
Wills, 40 **Cyc.**, p. 997, n. 39 New, p. 1004, n. 3, p. 1023, n. 22, 29, p. 1144, n. 53, p. 1146, n. 57, p. 1149, n. 77, 88, p. 1150, n. 91, p. 1165, n. 87, p. 1167, n. 94.

From Wallowa: WALTER H. EVANS, Judge.

---

4. Right of physician who attended testator before his death to· testify to his mental condition, see notes in **Ann. Cas.** 1912B, 1039; Ann. Cas. 1918A, 1050.

6. Testamentary and contractual capacity contrasted, see note in **Ann. Cas.** 1915A, 362.

8. See 28 **R. C. L.** 144.

In Banc.

On August 13, 1921, C. J. Allen, possessed of an estate of the value of $40,000 or more, made his will, wherein Mary E. Allen, his wife, was designated as the beneficiary. On the same date, he made and executed two deeds, whereby he conveyed one of his three farms to Joseph W. Allen, a son, and another to Jesse C. Allen, a second son. His remaining heirs at law are Earl B. Allen, son, and Ada Alice Hunter, Orpha E. Carlson, Mary E. Graham and Flora I. Childers, daughters. C. J. Allen died at Wallowa, Wallowa County, Oregon, on January 14, 1923. On March 7, 1923, the County Court of Wallowa County made an order admitting the purported will to probate, and letters testamentary issued to Joseph W. Allen. Within a year thereafter, the four daughters and Earl B. Allen, a son, each of whom was bequeathed $5, commenced proceedings to set the will aside upon the ground that, at the time the purported will was executed, the testator was mentally incompetent to make a will and was unduly influenced in executing the document purporting to be his last will and testament. Mary E. Allen, widow, and Jesse C. Allen and Joseph W. Allen, sons, are defending the will.

The County Court of Wallowa County found that the purported last will and testament of C. J. Allen admitted to probate was not his last will, for the reason that, at the time of the signing of the purported will and for a long time prior thereto, he was in poor health and weakened in mind and body to such an extent that he was easily influenced, and that he was induced to sign the purported will by reason of undue influence on the part of the contestees. On appeal to the Circuit Court it was found that, at the time of

executing the purported will, the testator was of sound and disposing mind and memory and was not acting under duress, fraud, restraint or undue influence, and a decree was entered reversing and setting aside the decree of the County Court and declaring the document to be the valid last will and testament of C. J. Allen, deceased. The contestants, appealing to this court, assert that the Circuit Court erred in reversing the decree of the County Court and in holding that the instrument in writing dated August 13, 1921, and witnessed by A. S. Cooley and Kenneth W. McKenzie, was the last will and testament of the deceased; that the court erred in not holding that the will involved herein was procured by contestees through undue influence, fraud and duress; and that the court should have found that the will was procured by contestees at a time when C. J. Allen was mentally incompetent.                                    AFFIRMED.

For appellants there was a brief over the name of *Messrs. Green & Hess,* with an oral argument by *Mr. Raymond J. Green.*

For respondents there was a brief and oral argument by *Mr. A. S. Cooley.*

BROWN, J.—1. The record in this case is unnecessarily lengthy, the testimony consisting of 1,887 pages of typewritten matter. In order to ascertain the merits of the cause, we have studied the entire transcript with much care; and, in so doing, we have been compelled to read a mass of irrelevant matter in order to sift out the relevant.

"Every person of twenty-one years of age and upwards of sound mind may, by last will, devise all his estate, real and personal * * ." Or. L., § 10092.

In this state, a sane man free from restraint may will his estate to whomsoever he may choose.

The first question that arises is that of the mental capacity of C. J. Allen. Before a person may devise his estate under the provisions of the statute, it is requisite that he be of sound mind. The term "sound mind," as used in the statute, is synonymous with "sane mind": 32 C. J. 620.

"The terms 'unsound mind' or 'of unsound mind' are generally held to include every phase of unsound mind rendering one incapable of caring for himself or his property; every species of unsoundness of mind. These terms are of such variable significance that their value in any given case will depend entirely upon the relation that they bear to a particular person in connection with a particular act under inquiry." 32 C. J. 621.

In the case of *Re Phillips' Will,* 107 Or. 612 (213 Pac. 627), we wrote:

"The law of this state, as announced by the rule adduced from the following decisions is that if, from all the facts and circumstances taken together, it satisfactorily appears that the testator, at the time of making his will, comprehends the nature of the act in which he is then engaged, knows the nature and extent of the property which makes up his estate and which he intends to dispose of, and has in mind the persons who are, should or might be, the objects of his bounty, and the scope and reach of the provisions of the written instrument, he has sufficient capacity to make a will."

See the many Oregon cases collected.

But the contestants also contend that the writing involved herein is not a valid will but is the result of undue influence brought to bear upon the impaired

mentality of the testator by Mary E. Allen and Jesse C. Allen, two of the beneficiaries.

Among the cases upon which contestants rely is that of *Greenwood* v. *Cline*, 7 Or. 17, where the facts are, in brief, as follows: On October 12, 1872, Mrs. Elizabeth Greenwood, 62 years of age, executed her will. Three years later she died, leaving an estate of the value of $26,000. By the terms of her will she bequeathed to contestants $100 each and the residue of her estate to Olive Newsome a granddaughter, and Mrs. Mary Cline, her remaining child. The will was attacked on the ground that the testatrix was of weak mind at the time it was executed and that, at that time, Mrs. Greenwood was laboring under a delusion with regard to contestants arising from undue influence exercised upon her impaired mind by Mrs. Cline and Mrs. Newsome, the beneficiaries. Upon trial of the issues the will was set aside. On appeal to the Circuit Court the judgment of the County Court was reversed, and the contestants appealed to the Supreme Court, where the will was rejected. The evidence showed that the testatrix had suffered a severe attack of paralysis a few years previous to the execution of her will, and that she had never recovered from that shock; that her memory became defective; that she would lease a tract of land and forget about it the next day; that she would ask the same question repeatedly. Two physicians testified that her mental powers were impaired. Other persons testified that her eyes had a dead expression; that she sometimes acted like an intoxicated person; that she was peculiar in her conversation; was absent-minded; that she paid no attention to her housework; that, on one occasion, while ill, she imitated with empty hands the action of a person breaking a piece of quartz and examining

it for gold; that she would give up her opinions to whomsoever disputed them; that, at one time, while going alone from Salem to Howell Prairie, her home, she became "turned around" and traveled back to Salem. William Scott, a witness who had lived at the home of testatrix during one winter, testified concerning her peculiarities that she told him "it was from the-effect of her head; that her head was hurt from the effect of a buggy running downhill with her." The record discloses that the testatrix was in the habit of attending spiritual seances in company with the Clines at the house of avowed spiritualists. On one of these occasions when the testatrix was present, a pretended communication was produced purporting to come from her husband, which purported message undertook to advise testatrix that her son William was a rough character and liable to squander her property. It further appears that, on another occasion, Mrs. Cline went to Howell Prairie to visit her mother and told her that her father's spirit had ridden out with her in the stage, and that he was very anxious that her mother should move to Salem and live with her. In that case, this court held that the testatrix had been unduly influenced.

2. As to what constitutes undue influence in the law of wills much has been written. But we believe that the following is plainly and clearly expressive of that term.

" 'Undue influence' is that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist." 4 Words & Phrases (2 Series), 1059.

Gross inequality of distribution of a testator's estate may be considered as a circumstance, although not of itself sufficient to establish undue influence: 1.

The American Law of Administration, Woerner (3 ed.), § 31, p. 62.

It is said that, though in strictness fraud and undue influence are distinguishable, more often than otherwise it is a mere choice of terms: *Ginter* v. *Ginter*, 79 Kan. 721 (101 Pac. 634, 22 L. R. A. (N. S.) 1024). Undue influence has in many cases been held to be a species of fraud: *Shipman* y. *Furniss*, 69 Ala. 555 (44 Am. Rep. 528); *Whitcomb* v. *Whitcomb*, 205 Mass. 310 (91 N. E. 210, 18 Ann. Cas. 410). The "undue influence" that will avoid a will must be such as to overcome the free volition or conscious judgment of the testator and to substitute the wicked purposes of another instead, and such influence must be the efficient cause without which the obnoxious disposition would not have been made: *In re Holman's Will*, 42 Or. 345, 358 (70 Pac. 908, 913); *In re Pickett's Will*, 49 Or. 127 (89 Pac. 377).

In the early case of *Greenwood* v. *Cline, supra,* this court held:

"What constitutes fraud and undue influence are questions that must depend on the circumstances of the case. They are in their nature inquiries which cannot be referred to any general rule. Where an arbitrary and unjust will is made in favor of one occupying a relation of confidence towards the testator, and who might have influenced his mind, slight evidence that he did exercise his power may suffice to invalidate the will. It is the duty of one occupying such a relation to disabuse the testator's mind of any false impressions he may have concerning others entitled to his bounty, and the omission to do so may afford ground for imputing to him undue influence." Syl., Point 2.

In *Tyler* v. *Gardiner*, 35 N. Y. 559, it appeared that the testator had for some time been under the con-

trolling influence of the principal beneficiary. In rendering its opinion, the court said:

"The will was made by the testatrix under two false impressions, which went to the very root of its provisions; one that her daughter was poor, and the other that her son was faithless and dishonest, and that he had purchased his farm with her money." Page 593. "It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity." Page 594. "It is no sufficient answer to the presumption of undue influence, which results from the undisputed facts, that the testatrix was aware of the contents of the instrument and assented to all its provisions. This was the precise purpose which the undue influence was employed to accomplish." Page 595.

From *Forman* v. *Smith,* 7 Lans. 443, 449, we quote:

"While fraud is never presumed, and must be established by evidence, it is established when facts are proved from which it results as a necessary inference; and, when such evidence is furnished, the burden of repelling the presumption which arises is upon the party who is charged with the fraud."

In *Rollwagen* v. *Rollwagen,* 63 N. Y. 504, at page 519, the opinion says:

"But the influence exercised over a testator, which the law regards as undue or illegal, must be such as to destroy his free agency; but, no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it. * * The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of

the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

The case of Sawyer v. White, 122 Fed. 223, 58 C. C. A. 587, was an action to avoid a deed for certain lands and to annul a will. The plaintiff based his attack upon the ground that the grantor had insufficient mental capacity to execute the deed and that the grantee, as the grantor's confidential adviser, procured the execution of the deed by undue influence. The grantor, Robert White, was eighty-eight years of age when he made the deed in question to his son, William M. White. The father had been partially paralyzed, with the result that he had talked and walked with difficulty for at least fifteen years, and his mind had also become weakened. At times during his period of illness, he was practically helpless and required constant assistance and attendance to enable him to rise from his bed and to procure and take his necessary food and drink, while at other times he was able to walk a block or two with the aid of a cane. In deciding the case, the court said:

"But the question of his mental capacity is not whether or not the powers of his mind were impaired, or whether or not he had ordinary capacity to do business, but whether or not he had any—the smallest —capacity to understand what he was doing, and to determine intelligently whether or not he would do it (citations). Any other test would wrest from the feeble and the aged that power over their earnings and savings which is their best safeguard against misfortune, and would produce endless uncertainty, difficulty and litigation. * * He understood perfectly what he was doing when he made it, and he was able to decide and did decide intelligently whether he would or would not execute the conveyance. * * The undue influence which will avoid a deed or will is an unlaw-

ful or fraudulent influence which controls the will of the grantor or testator. The natural influence of the affection of a parent for a child is neither fraudulent nor illegal, and courts will not set aside a deed or a will because it was induced by such an influence unless it appears that this influence was exercised to confuse the judgment and to overcome the free will of the grantor or testator.''

3. A. S. Cooley, the attorney who drew the will and prepared the deeds in the case at bar, testified as follows:

''Some time in August, 1921, I would say not to exceed a week prior to the date of this will, which is truly dated the thirteenth of August, 1921, C. J. Allen and Mary E. Allen, his wife, and J. W. Allen and Jesse C. Allen came into my office here at Enterprise. * * The matter first was to get the description of the land that was to be deeded to Jess and the description of the land that was to be deeded to Joe. * * ''

He then details the circumstances of the drawing of the deeds and the mortgages and takes up the matter of drafting the will:

''Now, after they had adjusted the matters there with reference to the deeds and mortgages, C. J. Allen, by something that he said, * * intimated to them that he wanted to talk to me alone, and they went out of the office. Then C. J. Allen sat there with me and talked to me for at least an hour. * * The arrangement was that I should draw the will, draw the deeds, draw the mortgages, and then go to Wallowa for the purpose of having them signed up. * * I went down on the train on the 13th of August, arriving there * * between 2 and 3 o'clock. I went from the depot to town.''

He then tells about his meeting with C. J. Allen and the arrangements for the execution of the documents:

"I had prepared the will for myself to act as one witness and I told him he would have to have someone else as a witness as it required two, and he asked me whether or not Kenneth McKenzie would do, and I told him he would be all right for a witness."

Concerning the execution of the deeds, mortgages and the will at the residence of the testator, he testified:

"And now it is my opinion and as a matter of fact I know that Mr. Allen at the time he was there in my office and at the time he signed that will was sane and absolutely normal and in just as good mental condition as he ever was in."

Witness then proceeded to relate the circumstances leading up to his acquaintance with the testator, and the time of such acquaintance, which involved the relationship of attorney and client. He testified that C. J. Allen "had a very bright, keen memory, and was a man, I would say, of more than average mental ability." Referring further to the mentality of the testator at the date of the execution of the will, he swore:

"Now, another thing that shows to me that he was bright mentally was this: I knew J. W. Allen and Jesse C. Allen * * . I knew Earl Allen * * . I don't think I even knew he had any daughters * * . Mr. Allen gave me their names and addresses that day in my office; for instance, 'Ada Alice Hunter, now of Caroline, Alberta, Canada'; and 'Orpha E. Carlson, now of Waitsburg in the State of Washington'; 'Mary E. Graham, now of Elgin, in the State of Oregon'; 'Flora I. Childers, now of Wallowa, in the State of Oregon.' * * He knew the land he wanted in the will, and he knew the land and how it lay that went to Joe, and the place that went to Jess with the exception of a forty-acre tract that belonged to Mary

E. Allen, and he called my attention to the fact that
that forty-acre tract belonged to Mary E. Allen. * *
At that time when he was there in my office, as well
as at the time when I was there in Wallowa and
he signed the will, there was not a thing wrong with
him mentally, and very little wrong with him physi-
cally so far as I could see."

Kenneth W. McKenzie, a druggist, and an ac-
quaintance of the testator of twenty-one years' stand-
ing, called as a witness on the part of the contestees,
verified his signature to the will as a witness to its
execution, and testified that the testator was sane.
However, that witness' testimony on cross-examination
is of great import in the consideration of this cause.
It follows:

"Q. Let's see, Mr. McKenzie, you recall having a
conversation with Mr. Earl Allen and myself in Wal-
lowa?

"A. Yes. * *

"Q. And we were there and discussing this matter
at that time?

"A. Yes.

"Q. And at that time you made a statement of
the facts, didn't you, in a general way?

"A. Yes.

"Q. And at that time I read over to you what you
had said, didn't I?

"A. Yes.

"Q. You said what I had written down was correct,
didn't you?

"A. I think so.

"Q. Well, now, I want to read over to you what
you said at that time (reading witness' statement):
'Kenneth McKenzie. I thought all of the property
was going to Mrs. Allen and leases to the boys. I
didn't know any different until in the fall. I knew
the old man had been sick and had a paralytic stroke,
and Mr. Cooley and Jess came and asked me to sign.
I had heard that the old man was losing his mind.

The old man didn't talk much. I don't remember what was said. I don't know the condition of his mind on that occasion.' That is what you told us, is it not?

"A. Yes. That place in the statement where it says, 'Mr. Cooley and Jess came and asked me to sign,' I can't remember that. I think possibly it was those two, but I can't remember it. I would rather scratch that out. I don't know who asked me.

"Q. Otherwise, what is written down there is what you told us about the facts at that time?

"A. Yes, as far as I know."

Joseph W. Allen, one of the contestees, testified that he was of the age of forty-six years and that he had resided for sixteen years upon the land deeded to him by his father and mother. He further testified to his father's strong mentality at all times, and that, long after the will was executed, his father expressed to him his satisfaction therewith.

Ernest F. Johnson, an old resident of Wallowa and a witness for contestees, testified that he had been acquainted with the testator for twenty-five or thirty years; that he had a conversation with the testator in June, 1921, and that at that time testator appeared to be normal mentally and that he talked with witness about the contemplated disposition of his property.

Jesse C. Allen, contestee, forty-two years of age, testified that he had resided on the tract of land given him by his father for about sixteen years; that his father was sane when he executed the will, and that his father was satisfied with the disposition of the property.

Leota Allen, nineteen years old, daughter of Jesse C. Allen, testified that she had resided with her grandfather "practically all of the time"; that her

grandfather "was a man of intelligence" and that she knew he was sane. In part, she based her opinion on conversations had with him. She testified:

"He helped me with my school lessons and he would send me down for things and I had no reason to think there was anything the matter with him. * * He helped me with arithmetic, and biology, and agriculture; most anything I asked him questions about; any subject I took in school, and he would help me."

She further testified to the following conversation had by the different members of the family relating to the deeds and will:

"She (Ada Alice Hunter, daughter of testator) asked grandmother why these deeds and papers were made out the way they were, and grandma started in explaining to her, and so she got to talking to her, so that grandma asked me to go and ask my father to come in. * * And he went in and then she jumped onto him about how the deeds was fixed, and grandpa heard the trouble and he went into the house and asked them what it was about, and she asked him why he had made the deeds the way he had, and he said, 'because he wanted them fixed that way'; and she says, 'You don't want them fixed that way.' She says, 'You would be crazy to fix them that way.' He says, 'I don't know. I have them the way I want them,' and she says, 'Well, don't you know that the way you have them that Mother could give that property and everything she has to whoever she wants to, to Joe or Jess?' She says, 'She can give it to them.' He says, 'Yes, ma'am, I know she can. That is what I want her to do with it.' He says, 'I fixed it. I give Joe and Jess what I want them to have, and I have given the rest to Mother,' and he says, 'She can do as she sees fit with it when I am gone if I go first.'"

Mrs. Daisy Allen, wife of Jesse C. Allen, testified that she had been acquainted with the testator since

116 Or.—31

the spring of 1899. She swears that Mr. Allen was a very intelligent man; that she met him from time to time in 1921; that she never noticed any change in his mentality prior to 1922, "when he was sick and had his headaches"; that, "he didn't want to carry on a conversation; he didn't like to."

Arminda Allen, wife of Joseph W. Allen, testified that she had been acquainted with the testator for thirty years, and that, in her opinion, he was sane during the whole of the year 1921, but that he became sick in the latter part of July or August, 1922. She denied ever having made any statements reflecting on the mentality of the testator.

Dr. John B. Gregory, the testator's family physician, testified that the testator was sane during the years 1921 and 1922, but that there were times when he was slightly disturbed mentally after August, 1922; that the difficulty consisted in occasional confusion of speech, making it hard for Mr. Allen to express himself, with the result that "he would ramble a little bit in conversation." He testified:

"I have seen him at times when he might be classified as slightly delirious or something of that kind."

Many acquaintances were called by contestees, who testified that, prior to, and at the time of, the execution of the will, the testator was mentally sound.

Mary E. Allen, aged sixty-eight, widow of the testator, testified, among other things, that she and C. J. Allen were married in Kansas in 1874; that they had reared a family of seven children; that they commenced their married life without property and, through their joint industry and thrift, had accumulated the property now valued at about $40,000. She testified fully, and apparently very frankly, about

consultations with the testator relative to his dispo-
sition of the property by will and deed, and that such
disposition met with her approval. She testified that
she lived with Mr. Allen as his wife for nearly half
a century, and cared for him, watched over him, and
nursed him during his last sickness until he died.
She claimed that he was of sound mind up to the time
of his death.

The will gives the widow, Mary E. Allen, control
of the property during her lifetime, with power to
sell or devise the same, and provides that at her
death the property, or so much thereof as shall be
remaining, together with the proceeds received from
any sale and not then disposed of, shall be divided
equally among the five children now contesting the
will. The record in its entirety shows that the tes-
tator had full confidence in the ability, integrity,
affection and motherly instincts of his wife and the
mother of his children.

Now we will set out portions of the testimony ad-
duced by the contestants:

J. T. Willett, a witness for contestants, testified
that he became acquainted with Mr. Allen in the
State of Kansas in 1876, and that they renewed their
acquaintance in Wallowa County, Oregon, in 1882;
that he regarded the testator as a successful farmer
and a shrewd business man; that during the last few
years he had lived just a block from the testator's
home, and that he had noticed that the testator was
in failing health, mentally and physically, as far back
as 1919; that testator's memory was bad, and that
he had complained of it to witness.

Mrs. Willett testified that her acquaintanceship
with the testator dated to their former residence in
the State of Kansas; that for a number of years last

past they had lived within a block of each other in the town of Wallowa, and that she had noticed his illness as early as 1920 or 1921.

"Q. Now tell the court what you noticed?

"A. Well, I noticed that his mind was going, the same as his body * * .

"Q. Now tell the court what, if anything, Mrs. Allen did at that time (at the dinner-table)?

"A. Mrs. Allen, you might say, superintended his eating. She would say, 'Now, Pa, don't eat that. You don't want to eat that now. Eat this.' I am not wording that *verbatim*. * * He didn't remember or know whether he should put syrup on his meat or his potatoes."

Concerning the testator's attempting to go to bed in a trunk on the front porch, she testified:

"He didn't undress or anything of that kind. Mrs. Allen and I were on the porch and there was a trunk out there that belonged to their daughter that came from Canada to see him and he wanted her to put him to bed there, and he acted like he was going to bed in that trunk. He didn't seem to know the trunk from a bed."

Witness thinks this occurrence was in August or September, 1922.

Giles Plass, County Commissioner of Wallowa County, testified that he saw the testator late in 1922, probably in October of that year, and that he was in a bad way mentally.

C. A. McLaren, a merchant at Wallowa, testified that the testator was considered a good farmer and an intelligent man, but that he noticed "in 1919 or 1920" that his mind wasn't very clear; that "his mind would ramble and wander" in carrying on a conversation.

John G. Wray testified that he had known the testator since 1904; that he had had conversations with him, and that, in the fall or summer of 1921, he discovered his inability to carry on a conversation.

Pearl Willett, a resident of Lostine, testified that he had been acquainted with testator for twenty-five or thirty years, and that "about two years ago" when he visited testator's house Mr. Allen failed to recognize him.

Joseph Schaut, a retired sheep man who had been a resident of Wallowa for about thirty-three years, testified that he had been acquainted with testator for thirty-two years and that they were mutual friends; that the testator complained to him about his health in 1921, but that he first noticed something wrong with Mr. Allen mentally on September 15, 1922, when they met and the following conversation took place:

"I says, 'How is the old boy?' When I said that he started to crying, * * and I asked him what was wrong. * * 'Well,' he says, 'I ain't got very long to live any more.' He says, 'I am a goner.' * * He got to talking about things, you know, about early days, you know, and he told me he was out of his mind once in a while, he wouldn't remember things, and he says, 'When I get over it I remember things again.' He says, 'Sometimes they come onto me. I get them spells and I don't know anything about what I am doing. But,' he says, 'when I get over them it seems my mind comes back to me again.' He told me sometimes he would go out onto the porch and was trying to get in and couldn't find the door to get in and he had to call for help to let him in."

His explanation of the testator's crying is given thus:

"Him (Mr. Allen) and me was friends all the time, and from the time we got acquainted until he died. * * I know he was a friend of mine and I was a friend of his. I thought of course his mind being in the shape it was, it kind of broke his heart it seemed like, and he went to crying."

In relating their intimate friendship, witness said that they had worked together from time to time, and that, during one harvest, "I was forty-two days with him on the thresher."

O. W. Pagin, court bailiff, testified that he had been acquainted with the testator since July, 1892, and regarded him as a good business man; that they had worked together for two or three years in the operation of a threshing-machine and had resided in the same neighborhood; that, when he was at the Allen residence at Wallowa on the last of May or the first of June, 1921, he thought Mr. Allen was wrong mentally because of the fact that, while at the table, Mr. Allen, with the sugar-bowl in his hand, said: "Ma, what is the reason you won't let me have any sugar?" He testified that Mr. Allen wondered what had become of all of the gold, and that he was not rational, as witness seemed to think, in his conversation about the location of a certain highway.

The contestants, together with acquaintances and neighbors of the testator, testify to circumstances tending to show the weakened mentality of the testator. However, most of the incidents related by them occurred subsequent to the drafting and execution of the will.

Now, referring to the expert testimony:

In the last of July or the first of August, 1922, Mrs. Allen, the testator's wife, and Mrs. Graham,

his daughter, accompanied him to the office of Dr. Kirby, of La Grande, who thus describes his appearance at that time:

"His appearance to me was a poor, decrepit old man, unable to enter the room without assistance, unable to answer my questions in giving his personal history. He didn't seem to know what was the matter, or what was going on. Most of the history I got of the case that day I examined him was from his daughter and his wife. * * The old man was afflicted with either dementia, senile dementia, probably secondary or terminal senile dementia.

"Q. Now then, based upon your experience there and your experience along that line, and your examination of the old man, and your knowledge of these diseases, would you be able to say whether or not in your opinion he had had this disease say from the first of July, 1921, which would be about a year prior to the time of this examination?

"A. Oh, the question of senile dementia, terminal dementia, resolves itself into this: It does not occur in a day. It does not occur in weeks, nor months. A man arrives at that after usually years of time."

Dr. W. D. Butler testified that during the month of May, 1921, he was at the house of C. J. Allen and remained there two nights and part of two days. Concerning his talks with the old man while there, he testified as follows:

"Q. Please state what Mr. Allen said, if anything, about his ability to remember, or about his mind, or both?

"A. He stated that he could not remember distinctly and he seemed to be worried on account of his condition and did not have the necessary money to get the proper treatment. He wanted to tell me something about his case and stopped at one point and said, 'Ma, come in here and tell this man what this is. I don't remember.' He also said to me,

'You know, sometimes I cannot remember anything. My mind is bad at times.'

"Q. What was the general character of his conversation?

"A. The general character of his conversation was rambling and he would suddenly break off in the middle of a statement and begin talking on some other subject. His mind did not seem to be clear and he could not follow a line of thought for any length of time. His ideas seemed to be badly disconcerted and broken."

The doctor further testified that Allen was suffering from senile dementia and that, "it would be a very simple matter to influence this man in his opinions and one probably close to him could get him to do most anything he might desire."

Dr. Carl S. Moore, a graduate of Jefferson Medical College of Philadelphia, and who was instructed in mental diseases by Dercum, a recognized authority in this country on mental diseases, in response to a hypothetical question testified that the testator was suffering from senile dementia.

"Q. In your opinion, Doctor, would he be able to understand the nature and amount of his property or the natural objects of his bounty in August, at any time in August, 1921, and in particular on the thirteenth day of August, 1921, his property consisting of three ranches, consisting of approximately 600 acres in three different ranches, and some timber land consisting of about 400 acres, and also personal property, all of the aggregate value of from forty to seventy thousand dollars?

"A. Well, I would say that his memory and judgment for details would not be good enough for that, judging from these symptoms. If those symptoms were all present, he would not have sufficient memory to remember the details of such business as that."

A like question was submitted to Dr. George R. Vears, and similar testimony was given in response thereto.

Opposed to the testimony of the experts adduced by the contestants is that of Dr. John B. Gregory, called as a witness on the part of the contestees. The doctor is a graduate of Birmingham Medical College of Birmingham, Alabama. As we have already seen, he testified that he was well acquainted with C. J. Allen and had been his family physician and that, in his opinion, Allen was sane. The doctor said of him:

"He came to my office in February, 1921, and I saw him at intervals from then on up to about the time of his death."

After admitting that Flora Childers and Mayme Graham, contestants, had called at his office in the summer of 1922, the doctor was asked the following impeaching question:

"Q. Now, isn't it a fact that, at that time, you three parties being present, they asked you about Mr. Allen's mind, and you made the following statement, or used words to that effect: 'I don't think that anything that he did would be legal. I don't think that anything he has done for a couple of years would have been legal. * * Why didn't you come sooner? I could have helped you a whole lot more and told you more about this matter.' "

Flora Childers testified, in reference to the impeaching question:

"As I remember, we asked him (Dr. Gregory) if anything that my father had done would be legal, and he said, 'Why,' he says, 'I don't believe that anything for two years would be legal.' I remember very distinctly his putting his hand up on his

chin and he says, 'I could swear for a year and a half,' and he went ahead to ask why we didn't come to him sooner, that he might have helped us a whole lot more."

The following question was put to Mayme Graham:

"Q. State whether or not at that time and place (Dr. Gregory's office, in August, 1922) you and Flora Childers being present and nobody else, that Dr. Gregory made the following statement, or words to that effect: 'Nothing that he did for two years before he died would be legal. I could swear that nothing he did for a year and a half before he died would be legal.'

"A. Yes, Dr. Gregory made that statement in his office at Wallowa. * *

"Q. What did he say about his mind?

"A. He said nothing would be legal for a year and a half."

Following proper foundation laid by the contestants when Dr. Gregory was a witness on behalf of contestees, Earl Allen gave the following testimony intended as impeaching:

"Q. I will ask you if at that time and place (Dr. Gregory's office in Wallowa a few weeks previous), yourself and Mr. Green and Dr. Gregory being present, Dr. Gregory did not make the following statement, or words to that effect, referring to your deceased father, C. J. Allen: 'He had heart lesion and cardiac trouble and that affected his blood vessels and brain and also caused lapse of memory?'

"A. Yes, he did."

4, 5. Dr. Gregory was competent to testify that, in his opinion, Mr. Allen was sane, or, that he was insane; but it was not for the physician to say whether a given act was legal or illegal, because that is a question for the court. A witness should not be permitted to testify that the testator had

capacity to make a will, or to execute a deed, for that is the identical problem before the court: *Walker* v. *Walker*, 34 Ala. 469; *Kempsey* v. *McGinniss*, 21 Mich. 123. The testator's capacity to make a will, or to transact business, is not a question of fact, but it is a conclusion which the law draws from certain facts as premises: *Walker* v. *Walker*, *supra*. However, the attempted impeachment of Dr. Gregory is by no means fatal to this case. The evidence of that physician relating to the sanity of the testator in August, 1921, is corroborated by the testimony of many disinterested witnesses, as well as that of the contestants themselves. Had the will been executed in the autumn of 1922 instead of the summer of 1921, the contestants' evidence would have been much more effective. Neither is the expert testimony of the contestants of great value, for the reason that it is based upon many asserted happenings in point of time long subsequent to the date of the execution of the will. Besides, some of the averred circumstances stated in the hypothetical question were not proved. And, finally, it must be remembered that the testimony of Dr. Kirby was based upon the testator's condition just about a year after the will was executed and a few months prior to his death. The quoted excerpt of Dr. Butler's testimony hereinbefore set out tends strongly to show the testator's incapacity to devise his estate, but a further examination of the physician's testimony greatly lessens the effect of what we have heretofore set down. It appears from the record that Mr. Allen possessed a milch goat, which, to him, was a novelty and a source of boyish delight. Concerning this, the doctor testified:

"He (Allen) was telling me about how much milk the goat produced and how much butter they made from it, and suddenly broke off in his conversation and began to talk on some other subject which I do not now recall. *His action in so doing* led me to the conclusion that something was wrong with his mind."

We have set out excerpts from the testimony of witnesses for the proponents and for the contestants for the purpose of illustrating the nature of the evidence. To quote all of the testimony would fill a volume of our reports and would be of no benefit to the parties or to the profession. From the evidence, the writer is convinced that Allen's memory was failing at the time he executed the will. But, conceding that fact, the same thing may be said of many elderly men who are engaged in business daily, and whose ability to dispose of their property by will or otherwise would not be questioned. Moreover, if C. J. Allen was a mental derelict, as claimed by some of the witnesses, it may, or may not, be pertinent to ask why his competency to do business was never challenged.

George Schaut, an old friend and fellow workman of testator, testified that, on September 15, 1922, the testator, in the course of a conversation, wept bitterly and said, in effect, that his memory was deficient at times and that, at other times, his mind was infirm, and that he was doomed to die. This shows, as does other similar testimony, that the testator knew and understood his physical and mental condition, and that he grieved over this condition.

6. The law does not undertake to prescribe the exact measure or degree of intelligence which a

testator shall possess. It does require him to be sound of mind and memory in such a degree as will enable him to know and to understand the business in which he is engaged at the time he executes his will.

It is important to note that no witness swears that the testator was not sane on August 13, 1921, the date of the execution of the will. That is the decisive point in this case. There is much testimony that he was sane on that date. The best witness for the contestants is Mrs. Flora Childers, one of testator's daughters. She was residing in her father's house and home and was present in the dwelling when he executed the will, and she does not assert that he was insane at that time. Measured by the many precedents established by this court, we are compelled to hold that the proponents have established the testator's testamentary capacity: *Hubbard* v. *Hubbard*, 7 Or. 42; *Clark's Heirs* v. *Ellis*, 9 Or. 128; *Chrisman* v. *Chrisman*, 16 Or. 127 (18 Pac. 6); *In re Cline's Will*, 24 Or. 175 (33 Pac. 542, 41 Am. St. Rep. 851); *Ames* v. *Ames*, 40 Or. 495 (67 Pac. 737); *Skinner's Will*, 40 Or. 571 (62 Pac. 523, 67 Pac. 951); *In re Sturtevant's Estate*, 92 Or. 269 (178 Pac. 192, 180 Pac. 595); *Collins* v. *Long*, 95 Or. 63 (186 Pac. 1038, 8 A. L. R. 1370); *In re Falling's Will*, 105 Or. 365 (208 Pac. 715).

7-9. The contestants say in their brief:

"It is our contention * * that Jess Allen was the prime mover in the conspiracy of his mother and his brother Joe to obtain the lands of the estate from the rest of the heirs, and that it did not matter to him which of the other children, if any, got any of the other land so long as he got what he wanted."

This statement is based upon some evidence. However, most of this evidence relates to motive and opportunity upon the part of Jess, rather than to the commission of overt acts.

Earl Allen, one of the contestants, testified that, while riding for cattle with his brother Jess, he told Jess a circumstance tending to show that their father's health was failing; that Jess then said that his daughter Leota, who was living with her grandfather, the testator, said that her grandfather and grandmother quarreled "like two kids"; and Jess further observed that, if he and Earl expected any land, they had better get it or Babe (Flora Childers) and Joe, who appear to have been the testator's favorite children, would "get the whole damn thing."

Jess Allen testified as follows:

"Q. You were not interested in your sisters and other brother enough to ask whether he (testator) was going to give them anything or not?

"A. No, I don't know that I was.

"Q. You were looking after Jess all of the time?

"A. Well, if a fellow don't look out for himself, nobody else will, sometimes."

It is the writer's opinion that the last answer paints the true character of Jess Allen.

Mayme Graham, one of contestants, testified, with reference to a conversation with her brother Jess:

"Oh, he told me about these papers being fixed up, and he told me if we started anything, why, none of us would get anything. He says to me, * * 'Pa was going to give you a thousand dollars and * * somebody knocked you out of that; Flora or some of them.' And he said if I would sit back away from Earl and Babe and keep my mouth shut, he would help me to get it. He said that Pa had

asked him if he had a thousand dollars to spare. He says: 'Who does Earl blame for putting him off the ranch—does he blame Bob and Babe?' I says, 'I don't know.' He says, 'I am the fellow that put Earl off, and I am going to put Babe and Bob off.' 'Well,' I says, 'Babe has the place leased. You can't put her off.' And he said he could. I says, 'Babe is Ma's baby and you will not turn her against her.' And he just scratched his head and he says, 'Wait until I see Ma and get through with her.' ''

Further testifying about the conduct of Jess, witness represented her father as telling her that Jess came to him and told him if he intended to give him anything "he wanted it now"; that he (Jess) wanted to put some improvements on the place, and when he (his father) was dead he didn't want the rest of them to come in and take it. She testified that testator then broke down and went to crying and said: "Jess is the only one that ever done that." As to a statement made by Jess concerning his associations with his father, she testified:

"When I was a kid, I don't know whether I was working in the potato patch or putting up hay, but I remember hearing Jess make the remark that Pa and Joe would do just as he said, because he had the goods on them.

"Q. You testified a while ago your mother threatened to leave your father if he didn't make the deeds?

"A. Well, she said she would go to Jess' and Joe's and stay and leave him alone there. * * It was because he wouldn't take his medicine. * * He broke down and went to crying and took across the house and he says, 'I have to do all as she tells me.' And she was sitting at the table and she went and got it, and he took his medicine. * * That was in 1922.''

Witness testified that, on one occasion in June, 1922, she was at her father's residence and he (testator) asked her the following question:

"He asked me * * if I thought there was $50,000 left to divide amongst the rest of us (after having deeded the land to the boys), and Ma was sitting in the house * * and she shook her head at me, and I says, 'No. I don't know where it can be.' And he says, 'That is what I thought. They told me there was $50,000 left. They said there would be $50,000 left after I would give them the deeds.'

"Q. What did he say about how he wanted this property to go?

"A. Well, he told me later in the fall, I think it was, that he intended to divide it right. He told me, he said, they had made him fix the papers, and he said if he had done it it would have been satisfactory. I asked him who fixed them and that is when he told me, Ma and Jess. He said somebody thought they were smarter than he was and fixed them themselves."

She testified that she had heard her mother tell her father that, "if he didn't fix them up (the deeds and the will), she would get up and go to Joe's and Jess's and stay."

"Q. Now, when your mother threatened to leave him without care if he didn't make out the deeds that way, what did he say?

"A. He said he wouldn't make them. He said whenever he got ready he would make them out. * *

"Q. What did they say to you about why you had been disinherited—what did she say?

"A. Well, she said we * * didn't deserve anything."

Flora Childers, one of the contestants, testified that the father's physicians advised him that it would

be beneficial to his health to go to a lower climate, but that, every time the father expressed a wish to go, Mary E. Allen, his wife, told him that—

"He had simply got to have his business fixed up before she would go with him. He had to get the deeds fixed up and she had to get the boys some places or she would not go away with him.

"Q. What, if any, threats did your mother make to induce him to make the papers the way they were made?

"A. She would just say she was going up to Jess' and Joe's and stay and he could stay there by himself, and he would start in crying and say he would do anything she wanted him to do."

Mrs. Childers testified that, in order to prejudice the testator against Earl, Jess told his mother that Earl was stealing his hogs. She testified that she accompanied her father and mother, Jess and Joe, to Enterprise when Mr. Cooley was engaged as an attorney to draft the deeds, mortgages and will; that the testator was not willing to go to Mr. Cooley's office, but that his wife prevailed upon him to go, saying to him, "Come on now and don't be silly." She further testified that, upon their return to the father's house, while they were sitting at the table during their evening meal—

"All of a sudden Dad commenced slamming the dishes. He just slammed the dishes back and he says: 'Now, you have made a mess of it.' And Mother says, 'What in the world is the matter with you?' just like she always did; and he said: 'You have made a gol darned mess of it.' I remember that distinctly. She says, 'You did it.' She says, 'That is your own doings. That is the way you wanted it.' He says, 'No, it isn't. I never wanted Jess to have that land that way.' * * He just
116 Or.—32

dropped his head down and cried and got up and left the table.''

The visit to Enterprise and the alleged declarations of the testator, as related by Mrs. Childers, were made a full week before the execution of the will. This visit to Mr. Cooley's office, as appears from his testimony, was made for the purpose of having the deeds, mortgages and will drafted, their execution being deferred until a later date by mutual understanding.

Robert Childers, husband of Flora, corroborates her testimony as to the declaration made by testator at the supper table.

Mrs. Ada Alice Hunter, another contestant, testified to the following conversation had with her mother after her father's death:

''I told her that she knew Pa had a paralytic stroke before any papers were made out and they were no good because anybody that had a stroke their mind was never right after that. She knew they were no good, and she says, 'What if he wasn't? * * They can't prove there was anything the matter with her. She was all right.' ''

According to the testimony of contestants, the testator made many declarations subsequent to the execution of the will tending to show that the deeds and the will were the result of the influence of the grantees named in the deeds and the beneficiary of the will.

Now, recurring to the effect of the testimony of Flora Childers and her husband concerning the conduct and declarations of the testator following the visit to Mr. Cooley's office: In considering that evidence, we are guided by the precedent established in *Turner's Will,* 51 Or. 1, (93 Pac. 461). In that

case the contestants, for the purpose of invalidating the will, sought to prove that the testatrix, after the execution of her will, stated that she had given her home place to Chauncy and the remainder of her property to her other children in equal shares. In the exposition of the case, the court held that the statements proffered might have been admissible to show the state of the testatrix' mind, and whether she fully understood and comprehended the nature of her act at the time she executed her will, but that such statements afforded no substantial proof of fraud, duress or undue influence.

The law casts upon the contestants the burden of proving their allegation that the will is the result of undue influence brought to bear upon the testator. If any part of the will is the product of undue influence, such part is void. If the entire will is the result of undue influence, then the whole will is invalid. It has been held that neither advice nor persuasion nor argument nor ascendency gained by legitimate affection can void a will made freely: *Estate of Elizabeth Hoge,* 2 Brewst. (Pa.) 450. The fact that the testator preferred his wife over all others can have no effect on his will. His reason for placing full confidence in his companion of half a century is not our concern. He but exercised the right which the law gives to him, and it is not profitable or fit that we speculate upon the justice or wisdom of his act. The law is plain. We have no right to substitute our judgment for his. *The burden of testimony does not show undue influence.* There is much testimony tending to show that the will is the will of the testator and of nobody else. The most effective testimony negativing the charge of undue influence is that of A. S. Cooley, the attorney who drew

and witnessed the will, and of Mary E. Allen, the beneficiary named therein. If Cooley tells the truth, the testator was not acting under undue influence at the time he executed his will. The chief beneficiary has been a very frank witness. She testified that she frequently discussed the matter of the disposition of the testator's property with him. She admits and declares that the execution of the deeds and will met with her "sanction." She further swears that Joe and Jess have been provided for, and says, in substance, that the property devised to her shall be divided among the remaining heirs as they deserve it, and that, in any event, it shall descend to them at her death. Contestants have stated no rule of law which declares it wrongful for a lawful wife to use her influence for her own benefit or for the benefit of another unless she acts fraudulently or coerces her husband to such an extent that he is unfit to act as a free agent. When the will is the free and voluntary act of the husband, it is a valid will. When the will is the result of undue influence upon the part of the wife, it is the wife's will and is invalid. In the case at bar, the will is the will of the testator, the husband and father. In *Latham* v. *Udell*, 38 Mich. 238, it was pertinently written by Mr. Chief Justice Campbell:

"A faithful wife ought to have very great influence over her husband, and it is one of the necessary results of proper marriage relations. It would be monstrous to deny to a woman, who is generally an important agent in building up domestic prosperity, the right to express her wishes concerning its disposal."

We have heretofore stated the nature and extent of influence that will invalidate a will. Undue influ-

ence is measured, not by degree, but by effect. If it destroys free agency, it is undue. Moreover, the undue influence that constrains must be present operating upon the mind of the testator in the very act of making the will: *In re Shaw's Will,* 11 Phila. 51. This the contestants have failed to establish.

The Circuit Court allowed costs and disbursements to the contestants in the County and Circuit Courts. We direct that, in addition thereto, the contestants recover their costs and disbursements on appeal to this court.

This case is affirmed.                    AFFIRMED.