Argued May 5, affirmed July 3, motion to recall mandate and
file cost bill allowed October 1, 1952

In the Matter of the Estate of
ELISE ROSENBERG, Deceased
INGRAHAM et al. *v.* STRUVE, Executor, et al.
246 P. 2d 858

*W. C. Winslow*, of Salem, and *John F. Kilkenny*, of Pendleton, argued the cause for appellants. With W. C. Winslow on the brief was Roy Harland, of Salem, attorneys for Emily Wodaege, Clyde Wodaege, Martha Daye Loeffler, Bertha May Rude, Anna Louise McKay and Lee McKay. C. C. Proebstel, Ralph Currin and Raley, Kilkenny & Raley, all of Pendleton, and W. C. Winslow, of Salem, filed a brief for appellants.

*E. F. Bernard* argued the cause for respondents and cross-appellants. On the brief were Collier, Bernard, Bernard & Edwards, of Portland, and Haas & Schwabe, of Portland.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and TOOZE, Justices.

LATOURETTE, J.

This is an appeal from an order revoking the probate of a will of Elise Rosenberg (hereinafter referred to as "Elise"), deceased, dated December 18, 1947, which order also admits to probate one of her previous wills dated September 25, 1947. She executed five wills in this order: July 7, 1943, August 8, 1947, September 25, 1947, October 8, 1947, and December 18, 1947, and died on June 12, 1949. Not knowing of the existence of the September and October wills until contest was instituted, contestants were permitted to amend to the effect that these two earlier wills were of no validity.

Elise, the testatrix, married Claus Rosenberg in Germany, after her first husband died. They came to this country after the wedding to live in Pendleton,

Claus' home. Claus had been married before, his first wife having died, leaving five children as follows: Henry, Herman, Katie (now Wodaege), Bertha (now Zanders) and Carolyn (now McKay). Henry, his oldest child, married Clara Hudemann, who is a leading figure in this will contest. She and Henry had six children as follows: Henrietta, Glen, Robert, Harold, Deane and Joy. Henry died on October 11, 1922. There is competent evidence that Elise's first husband left her a considerable inheritance, and that her husband, Claus, used it all to pay off his encumbrances. Claus' children lived with Elise and Claus until each became married.

Herman, another important person in this will contest, was named executor of his father's will, his father having died in 1919. His father left an estate of $233,-088.01. Under Claus' will, his wife, Elise, was bequeathed the following: income for life from his securities; all the other personal property, except household furniture and furnishings, to be converted into cash, one-half to Elise and the other half to his five children; the use and occupancy of the homeplace for life; one-half of the net annual rents from his real property, the residue to his five children.

The July, 1943, will, outside of small specific bequests, gave to each of Claus' (her deceased husband) grandchildren $100, and to Claus' children she gave "one set of plain green dishes to be divided among them as they see fit." The residue of the estate was given to two trustees to liquidate the same and divide the proceeds one-half to testatrix' Freeport cousins, contestants herein, and the other half, outside of $10 to her brother, Otto Lamaack, in Hamburg, to her sister, Christine Lamaack, of Germany, if she be living, and, if not, to the children of one Kurt Stuhr, of Ger-

many, if they be living, and if not, such half to the Freeport cousins.

The August, 1947, will, after certain small bequests, but eliminating Claus' children and grandchildren, gave the residue of the estate to the Freeport cousins, Margaret Ingraham of them being named executrix of the will.

The September, 1947, will was the same as the August will, excepting that Clara Rosenberg was given the homeplace in Pendleton, including household furniture and effects. Gilbert J. Struve was named as executor, replacing Margaret.

The October, 1947, will was the same as the September will with the exception that Herman Rosenberg, Claus' son, was given two half-sections of land in Umatilla county.

The December, 1947, will was the same as the October will except that the Freeport cousins were given $1,000 each, and the residue of the estate was given to her step-grandchildren, being Claus' grandchildren.

The evidence shows that Claus, Elise's husband, was a domineering German of the old school. He did not want his wife to acquire any education in this country other than what she could pick up in daily contacts. Claus' children mistreated Elise and did not take her into the home as a mother. There is testimony that one of Claus' daughters slapped her, and that Herman, one of his sons, accused Elise of not being married to his father, which wounded her deeply since she had a marriage certificate. Elise did not even have a decent dress to wear at her husband's funeral, and it was incumbent upon her brother, Henry Wessel, to procure a suit for her. Although Elise was left a life estate in the dwelling by her husband's will, she was unable to enjoy the sole occupancy of the same,

Herman continuing to live there for a period of eight years after his father's death. Having acquired her brother Henry's estate, and this being practically the entire estate now in contest, she went to Judge Fee, father of the present federal judge, and on his advice purchased from the heirs the fee title to the home so that she could enjoy the absolute freedom of it.

It is seen by the evidence that Elise never enjoyed to any great extent her inheritance from her husband, Claus, and in one instance, petitioned the probate court to compel Herman to account to her. Finally, after seven years of being deprived of her inheritance, a contract was entered into between Elise and Herman whereby he was to pay her $3,500 a year so long as she lived for her interest in the estate. Elise was compelled to sue Herman on the contract in an effort to get him to comply with the terms thereof. It is quite difficult to determine whether or not Elise ever received anything on the contract after suit was brought, although Herman, without receipts or cancelled checks, and through equivocal testimony, testified that he had paid her $40,000. Of this, the trial judge said:

" * * * It looks to me, from the evidence, as though she dismissed that suit for $25,000.00 without receiving anything for it except the home, and she already had a life estate in it. What did she get out of it? She got the house. I don't think she got hardly anything out of that Rosenberg estate. I think she was—advantage was taken of her when she did not know very much about the law in this country. I think she got very little out of it."

The evidence further shows that before her brother, Henry Wessel, died he told her that he never wanted the Rosenberg family to have any of his property and exacted a promise from her to that effect.

On the other side of the picture, Elise had a sister, Christine Lanaack, living in Germany, her brother, Henry Wessel, and certain blood cousins, the following named being very close to her and living in Freeport, Illinois: Margaret Ingraham, Etta Pfender, Alta Kruse, Alma Rucker, Doris Hoyman and Harry Kruse (hereinafter referred to as the "Freeport cousins"). As evidence of the close relationship between them, we have the following: Elise took Margaret to Germany with her when Elise returned to that country following a visit to this country beginning in 1904, where Margaret stayed for a year visiting members of the family and with whom they took several trips. On Elise's and Claus' return from Germany in 1910 they visited with the cousins in Freeport for around ten days. There is a history of trips made by various members of the two families to visit back and forth between Pendleton and Freeport. In 1929, Elise asked Margaret to come to visit her since she needed her presence while her brother Henry's estate was being settled. Margaret did this and remained for about ten days. In 1934, Elise took Margaret and her 12-year-old adopted son, Rod Kruse, to Germany for a visit with relatives. In 1939, Alta Kruse and Alma Rucker, of the Freeport cousins, visited with her in Pendleton. Throughout the years, birthdays, Easter holidays and Christmas holidays were remembered and occasioned the exchange of greeting cards, letters and gifts among them.

Up to July, 1947, Elise was in good health. She was in her 80's, weighed around 285 pounds, was strong-willed, had a good mind, and exacted rectitude from those dealing with her, believing in the old adage that a man's word is his bond. When a promise was made to her, she expected and demanded that it be kept as

given. Elise was particularly fond of her cousins, Margaret Ingraham and Alta Kruse, who lived with the other four cousins in Freeport. It appears from the evidence that there was an understanding between Elise and Margaret that, should Elise ever become seriously ill, Margaret would come to her. A next-door neighbor and close friend of Elise's, Mrs. Orton, who likewise plays an important role in this contest, upon Elise's sudden illness in July, 1947, at the request of Elise, and with Clara's knowledge, wired to Margaret to come to Pendleton. Margaret and her sister, Alta, who at that time were on their vacation away from their home, immediately left for Pendleton, without returning to Freeport, to take care of Elise. They arrived on July 25, 1947. Alta remained about four days and Margaret stayed until about August 14. Before Margaret left, Elise had regained her health, was up and about and in good physical condition again. Elise gave Margaret entree to her safety deposit box and handed her some jewelry belonging theretofore to her deceased brother, Henry Wessel, to be distributed among the Illinois cousins, according to her brother's wishes, and executed her second will, dated August 8, 1947.

Clara, Henry Rosenberg's wife, now enters the picture. Before September 10, 1947, Clara's daughter had done some housework for Elise for remuneration, and, on occasion, Clara had come over when the daughter could not act and did the work for Elise for compensation. Clara would run in occasionally to see Elise, and the evidence shows that Clara and Elise were on good terms.

Along about September 10, 1947, Mrs. Orton, the close neighbor, and Elise discussed having Clara stay with Elise during Round-Up time because of Elise's

home being in close proximity to the Round-Up grounds. Clara thereupon complied with Elise's request and entered her home. On September 15, 1947, Elise became seriously ill, went to bed and never got up again. On September 25, 1947, Elise executed her third will.

■ The theory of the contestants is that the September, October and December wills were executed through undue influence occasioned by fraud. It is their contention that the fraud was perpetrated by Clara and Herman in the particulars hereinafter set out. There is also a claim of mental incompetency, but the record overwhelmingly shows that Elise was mentally competent to execute all the wills involved.

The hub of the controversy in this matter is: what was the understanding between Elise and Margaret regarding Margaret's return to Pendleton when she left in August, 1947? It is respondents' contention that Margaret was to return to Pendleton whenever Elise became ill *and she was sent for.* It is the appellants' contention that Margaret was to return to Pendleton *without being sent for,* and, because she didn't return, Elise was crushed and, consequently, disinherited her, with the exception of a small amount. In this connection, we quote from appellants' reply brief as follows:

> "Herman was fifteen days late in making the payment due January 1st, 1931; this was at the bottom of the depression. The filing of this suit is demonstrative evidence and corroborates the testimony of the witnesses throughout the trial of this case, that when you made a promise to the testatrix it had to be kept; when things were to be done they had to be done, now not tomorrow. It also explains why the [t]estatrix turned against the Freeport heirs when they failed to make good their promise to return and take care of her."

■ It is urged by appellants that the court erred in not allowing the appellants' motion to dismiss the contest on behalf of the Freeport cousins. It is claimed that they have no right to contest the will because they are not entitled to participate in the estate under the law of descent and distribution, citing *Peterson v. Carlson,* 153 Or 327, 56 P2d 347. A careful reading of that case discloses that the contrary is true. In that case a former will was not in evidence. The presumption was that the same had been destroyed. In the instant case the will of August, 1947, and those following, created a beneficial interest in the Freeport cousins, were introduced in evidence at the trial, and, therefore, the cousins had a sufficient interest under these wills to contest the December, 1947, will in question. See § 19-2084, OCLA.

The contestants and respondents set forth the following proposition:

"The Wills of Elise Rosenberg dated December 18, 1947, October 8, 1947, and also that dated September 25, 1947 (cross-appeal) were obtained and brought about by fraudulent representations made to and undue influence and coercion upon Elise Rosenberg, and none of these wills should be admitted to probate as her last will and testament, * * * ."

Before further discussing the facts in this case, we will proceed to the discussion of the law applicable.

■■ In the case of *In re Dale's Estate,* 92 Or 57, 64, 179 P 274, Chief Justice McBRIDE clearly set out the law relative to undue influence as follows:

"Undue influence of this character is never presumed but must be proved like any other fact, but as it is frequently incapable of being established by direct testimony, circumstantial evidence is often admitted for that purpose.

"In considering the question as to whether or not undue influence has been exerted in a particular case, one is naturally led, first, to inquire into the opportunities which the person accused of this species of fraud, had to exert such control over the intention of the testator. Among these is the existence of confidential relations between the testator and the person so charged. While the existence of such a relation will not of itself, according to the weight of authority, create a presumption of undue influence, it is a circumstance which, taken in connection with other suspicious circumstances, may justify such an inference of undue influence as to put upon a beneficiary, the burden of showing, by at least equal evidence and in many jurisdictions, by the preponderance of evidence, that no such influence was exerted."

See *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572; *In re Lobb's Will,* 173 Or 414, 431, 145 P2d 808; *In re Porter's Estate,* 53 Adv. Sh. 173, 179, 235 P2d 894.

■ Where a confidential relationship exists between a testator and the beneficiary, slight evidence is sufficient to set aside a will on the ground of undue influence. *In re Estate of Meier,* 190 Or 140, 150, 224 P2d 572; *Greenwood v. Cline,* 7 Or 17.

■ Among the circumstances to be considered in determining whether undue influence was exercised are a decided discrepancy between a new and previous wills of the testator; a continuity of purpose running through former wills indicating a settled intent in the disposition of his estate; and, the disregard of natural objects of testator's bounty. *Newman v. Stover,* 187 Or 641, 656, 213 P2d 137; *In re Hart's Estate,* 236 P2d 884; *In re Walther's Estate,* 177 Or 382, 397, 163 P2d 285.

■■ Undue influence may be exerted through the medium of fraud, and a will procured through fraud is void. *Estate of Allen,* 116 Or 467, 474, 241 P 996.

■ A will may be voided where there is fraud in its inducement, as well as fraud in its execution, and where a beneficiary deceives a testator as to extrinsic facts, which facts are material and known by the beneficiary to be false and which cause the execution of the will, the same is invalid. *In re Bottger's Estate,* 14 Wash2d 676, 129 P2d 518, 528; *McCartney v. Homquist,* 106 F2d 855, 126 ALR 375; 57 Am Jur, Wills, 270, § 371; 1 Page on Wills, 353, § 179.

■ Where a beneficiary under a will conceals or suppresses facts where it was his duty to disclose such facts where there is a confidential relation existing between them, such may constitute fraud sufficient to void a will. *In re Nutt's Estate,* 181 Cal 522, 185 P 393; 68 CJ, Wills, 741, § 434. We find the following language in 57 Am Jur, Wills, 270, § 371:

> " * * * Fraud invalidating a will is said to be any trick, deception, or artifice by which the testator is so circumvented, cheated, or deceived as to fall into error respecting the disposition of his property."

■ Where a will was executed on false data brought about by fraudulent representation by or on behalf of a party or parties benefiting from the will, although the will may express his wishes and be his free and voluntary act at the time, such will may be set aside on the grounds of fraud, such fraud being a species of undue influence. *Greenwood v. Cline,* supra; *In re Bottger's Estate,* supra; *In re Newhall's Estate,* 190 Cal 709, 214 P 231; 68 CJ, Wills, 740, § 433.

■ Where undue influence or fraud brings about the execution of a will, the whole will is void, even though such fraud is perpetrated by only one of the beneficiaries. *Estate of Allen,* supra; *Coghill v. Kennedy,* 119 Ala 641, 24 So 459.

■ If a will is invalid when made, there can be no ratification of the same even though, after the discovery of the misrepresentation, the testator allows the will to stand. *Haines v. Hayden,* 95 Mich 332, 54 NW 911, 916; *Chaddick v. Haley,* 81 Tex 617, 17 SW 233, 235; 1 Page on Wills, 392, § 194; Atkinson, Wills (1937) 225, § 100.

■ That there was a confidential relationship between Elise and Clara cannot be doubted. Clara moved in to be company for Elise and to do housework on September 10, 1947, during the Pendleton Round-Up. She remained there as housekeeper and practical nurse until Elise's death in 1949. After Elise's illness of September 15, 1947, she was bedfast and dependent almost exclusively on Clara, who was her constant companion, took care of her communications—mail, telegraph and telephone—did her banking and tended to all of her personal needs. See *In re Estate of Meier,* supra.

Reverting to the agreement between Elise and Margaret prior to Margaret's leaving for Freeport in August, 1947, we will now discuss the evidence on that important phase of this case. At the time of her departure, Elise had regained her health to the extent that she was able to be up and around and continued to live as she did prior to her illness. Margaret testified that she promised Elise that she would return to Freeport to get her business in shape so that if Elise needed her she would respond and return immediately to Pendleton. Her testimony is, ''Well, I couldn't stay, as I told you. Nobody can stay for a year or more with a little vacation baggage and she was perfectly well when I left. She was doing the cooking. She was well and very happy that I was going home and get things straightened out and come back as soon as she

called for me. That was the agreement. That's the way I left her.''

In fact, Clara, pursuant to the following testimony, admitted that such was the understanding:

"Q She [Margaret] said she'd come back whenever she was needed?

"A Yes. She said she'd come back whenever she was needed.''

It is true that Clara in other parts of her testimony testified that the understanding was that Margaret was to come back as soon as she got her affairs straightened out.

Mrs. Orton, Elise's next-door neighbor, in detailing her conversation with Elise after Margaret had left Pendleton in August, testified as follows:

"Q Now, did she [Elise] mention anything to you about Margaret's return to Pendleton?

"A She said that—she said Alta had gone back —she told me which day. * * * That she had gone back to the lake and Grete had gone back to take care of things. She said, 'After all, I'm perfectly— I'm all right. And I like to be alone.' And she said, 'Grete will come back when I want her. I will send for her and she will be back when I want her.' * * *.''

Mrs. Muller, an aged lady and a close friend of Elise's, gave evidence when called by appellants. It is difficult to follow her testimony since it is impossible to tell from the same when the various conversations occurred; however, her following testimony is significant:

" I am trying to figure out what caused—just what caused Mrs. Rosenberg to be hurt and disappointed about the cousins. Just what was it?

"A I told you.

"Q I was trying—was she disappointed because they left to go back east?

"A I don't think so. * * * "

In connection with the agreement, Mr. Cunha, the attorney who drew and, along with his wife, witnessed the wills, testified:

"Q Do you recall whether or not at that time if there was any talk in that conversation about Mrs. Ingraham going home or anything like that?

"A As I remember it, she was to go back and take care of some of her affairs and return. I don't think there would have been any discussion or anything would have come up, had the question not been raised of residence."

The above testimony does not detail the conversations Mr. Cunha had but is merely a conclusion.

Another witness, Katie Lorenzen, testified as follows:

"Q Do you recall Elise having told you anything about why they left and what arrangements were made about their return?

"A Yes, she did say they were—or Mrs. Ingraham was coming back as soon as she had her business taken care of.

"* * * * * *

"Q Did she say when Mrs. Ingraham was to be back out?

"A No. I don't remember that."

Let us now progress to the other evidence in the case throwing light on the agreement between Elise and Margaret. When Clara returned, after seeing Margaret to the train on August 14, she reported the following conversation to Elise:

"Q Did you have any conversation with Margaret on your way to the depot? or during that time?

"A At the depot she said if she would come and stay, she couldn't sit right in the house doing nothing, that she was going to get her a job.

"* * * * * *

"Q And do nothing, you mean?

"A Well, I don't know what her idea was. That's what she said and that's what I told Grandma [Elise] about.

" * * * * * *

"Q * * * do you mind telling us why you went back and repeated that conversation to Grandma?

"A I just figured it was Grandma's business to know.

" * * * * * *

"Q Well, Grandma didn't ask you to tell her what you and Margaret talked about on the way to the depot?

"A No. I just did it."

Of this matter, Margaret testified:

"Q Didn't you also tell Clara that if you did come out here, you had to get you a job?

"A No. I said I'd bring my work out. I'd have to have work to do.

"Q * * * You did tell her that you'd have to have something to do?

"A Yes. My hand work."

On September 15, Elise again became ill. That Elise thought Clara was writing to the Freeport cousins is evidenced by the following testimony of Mrs. Orton:

"Q Now when she become—became ill, did you ask Elise why the girls didn't come?

"A I don't know that I did. I think I—I guess I asked her if the girls weren't coming and she didn't seem to know. I believe that was it.

"Q Did Elise say anything about the girls — having written for the girls to come?

"A She just said Clara was writing to the girls.

"Q She said Clara was writing to the girls?

"A Yes, she said Clara was writing to the girls.

"Q  To come?

"A  Well, I think she just said Clara was writing and telling the girls how she was, I guess.

"THE COURT: How she what?

"THE WITNESS: How she was feeling, I suppose. She said Clara was writing."

Later on Mrs. Orton again had a conversation with Elise as the following indicates:

" * * * So in the morning I went over and she [Elise] was in bed and Clara and I were in her bedroom with her and I told her immediately that Grete had called and that she was worried about her and she was—I said, 'Grete said she didn't know you was bedfast.' And she said, 'Clara wrote.' "

At first, according to Mrs. Orton, Clara told her that she had written to the girls about Elise's condition; however, when questioned again by Mrs. Orton, we have the following:

"Q  Did you say anything to Clara about writing to the girls?

"A  I did one day.

"Q  And what did Clara say to you?

"A  Well, she told me to—it was her business. It probably was—I wasn't in charge.

" * * * * * *

"A * * * and I told Clara then that I just didn't believe that the girls realized or knew how bad Grandma was or they surely would come. And I thought I would write them and then she said, 'No, you keep your nose out of this.' She said, 'I'll do the writing.' * * * "

It is important to note that Clara on the witness stand admitted that she had never written to the Freeport cousins about Elise's condition, claiming that

Elise instructed her not to write. To us the latter statement, in view of all the circumstances found in the record, is unreasonable and a figment of Clara's imagination.

No doubt thinking that she was going to die and desiring to remunerate Clara for the excellent service she had rendered her, she executed the September 25 will giving Clara the residence but leaving the terms of the August will intact other than substituting an old-time friend and resident of Pendleton, a Mr. Struve, as executor instead of Margaret. It is significant that the residue of the estate was to be given to the Freeport cousins, the same as the August will provided. Six weeks had elapsed since Margaret had left, and it is reasonable to infer that if Margaret had agreed to wind up her business and return to Pendleton and had failed to keep her promise, Elise being one, according to the evidence, who wanted people to keep their agreements punctually and to the letter, she would then have cut the Freeport cousins out of that will. It is also significant that the evidence shows that on her becoming sick on September 15 she had directed Clara to write to Margaret of her illness. Clara testified that she never wrote to the Freeport cousins until after the last will had been executed, reference to which letters will be made hereinafter.

Shortly thereafter, Herman, the stepson with whom Elise had had so much trouble, moved into the picture. He brought her produce from the farm, turned her in bed, turned the mattress and made himself quite a handyman around the premises. Along came October 8 and not having heard from Margaret, it is again reasonable to infer that Elise became more distrustful and annoyed at Margaret and executed another will in which Clara was left the homeplace, Herman two sec-

tions of land which Elise had inherited from her brother, Henry Wessel, contrary to her agreement with her brother, and the residue of the estate to the Freeport cousins.

Came December 18 and Margaret had not yet arrived, and Elise undoubtedly made up her mind that Margaret was just after her money, had no interest in her, had broken her promise, and she then executed the last will in which she disinherited the Freeport cousins, other than $1,000 each, and left her entire estate to her in-laws, again contrary to her agreement with her brother, Henry.

Margaret, according to the testimony, had written letters periodically to Elise and claims that she knew nothing of Elise's illness until December 21 when she contacted Mrs. Orton by telephone, not wanting to disturb Elise at night and knowing nothing of Clara's staying with Elise. Mrs. Orton told her of Elise's illness, and she remarked that she would come right out. Mrs. Orton advised her not to, indicating that she would encounter some trouble if she came. Disregarding such advice, Margaret and her sister, Doris, went to Pendleton and to the office of Mr. Cunha where they first learned that the August will had been changed. Before leaving for Oregon, Margaret received the following letter from Clara:

"Dear Margaret and Alta,

"You pkg came and Elisa & I thank you very much, and will enjoy it when we have it if our afternoon tea or coffee.

"Orton was over and told us you had called over there last night worring about Elisa, isnt it a little bit to late for that. You knew Elisa wasnt well when you left, why didnt you stay then she wired you to come for the intention of staying but you had

difference planes, and you told me you would never sit at home with her doing nothing remember.

"I am as writing for Elisa, cause it is hard for her to sit up to long but manges to sit up eating her 3 meals and most of the time enjoyes them.

"She told me to tell you for you girls to just remember her when you last saw her. And not bother of coming down cause what there is to do I can manage just fine at least it plases her. She said her mind is as clear as anybodys else is perfect. ["perfect" was encircled] Will now close for now with wishing you a Merry Xmas and Happy New Year,

"Will call when we　　　　Love
　realy need you.　　　　Elisa & Clara"

After Margaret and Doris arrived in Pendleton, the following letter from Clara arrived in Freeport:

"Dear Greta,

"Received your letter to-day saying you was making reservation to come but cancel it for Elisa says you had a chance but refuse it, so she refuses your coming. She said she has spent all her life along and perfers to continues to do so. She also says it makes her neverous for two to be around here she like it to be quite when she wants to sleep. Katie wanted to come but she said No she didnt want her either.

"Mrs. Rochlk passes away Sunday morning early.

"She wants you to remember her the last time you saw her, now she is every thin you would like to see her that way.

"When she passed away we will send you a wire, and she thinks that is soon enough. The reason she want me to write this was is you have hurt her very much, and you can ever fix it up again.

　　　　　　"Love,
　　　　　　"Elisa & Clara."

Since Clara had acquired practically the entire estate for her children and other members of the Rosenberg family, it can be seen why she did not want Margaret to come to Pendleton where she would be in a position to upset the applecart.

It appears from the evidence that when Margaret and Doris went up to see Elise they received a cool reception, Elise saying, " 'Why you come?' " After staying a few days, they returned to Freeport and thereafter, up to the time of Elise's death, Margaret and the other cousins wrote intermittently to Elise but never received any communication back until after Elise's death.

■ As to the promise between Elise and her brother, Henry, that the Rosenbergs should never receive any of his property which Elise acquired from him, we have the testimony, by deposition, of three relatives in Germany, of Mrs. Orton, and of Mrs. Lorenzen, a friend of Elise's and a relative of the Rosenbergs. It is argued that such testimony was inadmissible. However this may be, appellants made no objection to the introduction of such evidence other than on the grounds that it was too remote. The evidence, therefore, had probative value. *Egli v. Hutton et al.,* 135 Or 175, 178, 294 P 347; *Gilman v. Burlingham,* 188 Or 418, 426, 216 P2d 252.

Mrs. Lorenzen testified as follows:

"Q Mrs. Lorenzen, did she [Elise] ever tell you of a promise of any kind that she made to her brother, Henry Wessel?

" * * * * * *

"A Oh, I guess she did. She told me on his death that it wouldn't go to the Rosenbergs, it would go to her folks. But that's ten years ago, when she told me that.

"Q She promised that to Henry Wessel on his death bed, that his property would not go to the Rosenbergs?
"A Yes."

■ Appellants next suggest that since the answers contained in the depositions of the German relatives in some instances were identical, the Freeport cousins framed the answers for the German witnesses. This is pure surmise and has no foundation in fact. It must be remembered that these relatives are Germans, and it is questionable whether or not they could speak the English language. The American Commissioner took their testimony which was transcribed on a typewriter. Since the questions directed to all of the witnesses were practically the same, it could just as readily and reasonably be assumed that the Commissioner put down the answers in accordance with his free translation rather than literally.

We are reminded of the coolie who was on the witness stand being interrogated through an interpreter. The attorney propounded a question, whereupon the interpreter submitted the same to the witness who thereupon indulged in an extended Oriental answer. Upon being asked by the attorney what the witness said, the interpreter replied, "He say 'no.' "

■ We believe, as did the trial court, that the agreement between Elise and Margaret was as outlined by Margaret. Not only does the weight of the testimony sustain this view but the circumstances lead to this conclusion. Elise told Clara to write to Margaret when she became ill in September. Clara did not write. Margaret and the Freeport cousins wrote to Elise, and it is reasonable to assume that since Clara had charge of the mail that Elise never received the letters. The execution of the three wills so close together indi-

cates the growing progressive distrust of and loss of confidence in Margaret because she did not keep her alleged promise and come to her when she was sent for after she thought she had been notified by Clara. It is inconceivable that Elise would have turned on her blood relatives, after all their years of close association, in such a short space of time covering four months unless she was the victim of deception, and more specially is it unreasonable that Elise, after having given her promise to her brother that the Rosenbergs would never receive any of his property, would have broken her word and turned practically the whole of it over to them.

There were 45 witnesses who testified at the trial, and the evidence comprises 855 pages of the transcript. The cold record shows many inconsistencies in Clara's testimony, including an instance where she was caught up on her testimony in chief when asked if she wanted to explain that to the court she answered, "No, I don't want to explain anything to the court"; and another instance where her memory as to certain transactions was vague and faulty when she was asked to repeat what Grandma told her to write in the letters hereinbefore quoted, the following occurred, indicating that the letters were of her own composition rather than Elise's:

"A  Oh, that I can't remember.

"Q  You can't remember?
"A  No, I can't remember.

"Q  You can't remember any of it that Grandma said?
"A  No.

"Q  You can't remember anything on which this statement in your letter is based?
"A  No."

Another glaring example of her lapse of memory is where she testified that she knew nothing of the wills. Mrs. Muller testified, referring to her conversation with Elise, in the following language: " * * * She [Elise] told me, as I have told you, she was going to make the will over that way. She said, 'I have talked to Clara about it and, I think, Clara would be a whole lot better,'."

Clara's fabrication of the story that Margaret told her upon leaving in August that she was coming back to get a job and then repeating the same to Elise gives some idea of Clara's deceitfulness.

Clara claims that when she went over to work for Elise in September, 1947, during Round-Up time, Elise agreed to give her the homeplace in addition to compensation for her services. When she told Mrs. Orton of the arrangement with Elise, she mentioned nothing about the homeplace but only referred to the monetary compensation. At that time it must be remembered that Elise was up and about and not sick, and it is extremely unreasonable that Elise would agree to give Clara the dwelling house for staying with her during that short period.

■ The credibility of the witnesses is essentially for the trial court. Weight, therefore, must be given to the court's judgment in this regard. We are impressed by what is said in *Boyd v. Boyd,* 252 NY 422, 429, 169 NE 632, cited with approval by Mr. Justice Jackson, of the United States Supreme Court, in delivering the opinion of the court affirming Judge McColloch, in *United States v. Oregon Med. Society,* 343 US 326, — L ed —, 72 S Ct 690, decided April 28, 1952, as follows:

" 'Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful

cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth . . . . How can we say the judge is wrong? We never saw the witnesses . . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' ''

In this regard and in other respects, because of the importance of this feature of the case, we quote from the oral opinion of the able and experienced trial judge:

"In this case there has been a great deal of evidence, and I am satisfied in my own mind that the question of the credibility of witnesses on the witness stand is one of the greatest importance in this case; and the Court has watched the witnesses very closely and listened very carefully to the testimony, in an effort to determine the credibility which should be allotted to the testimony of the various witnesses.

"Now as to Clara Rosenberg, counsel made the statement that she did not have very much education. However, she appeared to be a person of ordinarily bright mind, but I could not help but be impressed by the fact that she was extremely vindictive on the witness stand, especially against Mrs. Orton, a neighbor. I have not been able to find a single item of testimony which would justify her animosity towards Mrs. Orton; and again towards Margaret Ingraham and Alta Kruse she displayed a great deal of venom. They were very kind to her on the witness stand. The fact is, I thought they went out of their way to say a few kind things about her. Not only her vindictive attitude, but the contradictions in her testimony,— I don't want to be unjust or unfair to her at all, but she unquestionably did contradict herself at various times on the witness stand; * * * and I just can not give a great deal of weight to her testimony.

"There was Mrs. Orton. Mrs. Orton was a next-

door neighbor, a witness who—it was very obvious —was testifying extremely reluctantly against people in Pendleton who had been acquaintances of hers for years; and the impression I had was that she could have testified to a whole lot more if she had really wanted to, but the testimony—to some extent—almost had to be dragged out of her; and I thought she tried to be just as fair as she possibly could to Herman and the Rosenbergs; and I am impressed with her testimony throughout. I think that woman was unquestionably telling the truth.

"Now there was Margaret Ingraham and Alta Kruse. Those people really are unquestionably high class people, and people who appeared to have considerable self respect and integrity; and I could not help but believe them, and I don't believe any other judge or jury would have done otherwise but believe them from the witness stand.

"Herman made a very good witness, except as to his dealings with Elise. There, as has been stated, he contradicted himself. I think he told some four different stories.

" * * * I don't think she [Elise] got hardly anything out of that Rosenberg estate. I think she was—advantage was taken of her when she did not know very much about the law in this country. I think she got very little out of it. * * *

"Now this is from the testimony of Mrs. Orton: —Elise said that she had tried to be a good stepmother, but she had never been accepted by the Rosenberg children. Mrs. Orton made the statement that the enmity between the Rosenbergs and Elise was generally known. * * *

"She told Mrs. Orton that she came over here from Germany with money which had been left her by Dobbler [sic], and she thought she was going to be high up and have a prominent place. Instead of that she found her money was used to pay off the Rosenberg mortgage on the Rosenberg land, and that she never was paid.

" * * * * * *

"Now the evidence pretty well establishes, I think, that the land which Herman Rosenberg got came from Wessell. I am rather inclined to think that practically everything else was from her half-brother's estate.

"These cousins, while not in direct line, were, to my mind, unquestionably the natural objects of her bounty because of the intimate relations which had existed over the years, * * *. I think that she dreaded going to the hospital, and that Clara kept filling her mind with the fear of loss of security in that respect—that Margaret would not take care of her, Margaret would get a job, and she would have to go to the hospital in her last days and would lose the security of her home. I think she kept filling her mind with resentment. I am satisfied from the great preponderance of the evidence that the agreement was as Margaret claims it was, that is, that Elise told her that she liked to live alone, she was better, and that she would let her know when she wanted her to come back.

" * * * I am satisfied that the great preponderance of the evidence here supports the claim of the Contestants as to what the arrangement really was.

" * * * * * *

"I think that Clara kept filling her mind with the thought that Margaret should come back right away, as soon as her business affairs were arranged, but actually that was not the agreement at all, and I think she could very easily have notified Margaret about the condition of Mrs. Rosenberg, but she failed to do that. She kept that from her cousins. I think that, again, is a species of undue influence that had the effect of creating the strongest kind of resentment against them, because of neglect."

■■ We do not believe that there is any merit in the cross-appeal by which contestants seek to have the August will reinstated and probated. Although from the time Clara took over in August up to the time when

the September will was executed she was undoubtedly injecting some poison, we have no assurance that Elise reacted to such injection. The evidence shows that Clara merited the gift of the home on account of the valuable services she had performed for Elise up to that time. It is a well-known rule that there can be no actionable fraud unless the other party has acted to his detriment by reason of the same.

Affirmed.

## MOTION TO RECALL MANDATE

*Raley, Kilkenny & Raley, Ralph Currin,* and *C. C. Proebstel,* all of Pendleton, for motion.

*Haas & Schwabe,* of Portland, contra.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and TOOZE, Justices.

## LATOURETTE, J.

On the third day of July, 1952, we rendered an opinion in the above entitled cause in which we affirmed the order of the lower court. No mention was made of costs and disbursements. Subsequently, respondents filed with the clerk of the court their cost bill against the appellants who objected to the same and petitioned the court for a ruling that costs and disbursements be awarded to all the parties against the estate of the deceased. Thereafter, we disallowed respondents' cost bill against the appellants but were of the opinion that appellants' petition to allow costs to all the parties against the decedent's estate should be allowed. Whereupon, a mandate was issued in conformity with such opinion. Thereafter, appellants tendered their cost bill and motion to recall the man-

date so that the amount of their costs and disbursements could be inserted therein. Respondents objected on the ground that appellants had not filed their cost bill within 20 days from the time the original opinion was rendered, as required by ch. 23, Oregon Laws 1943.

No official record was entered in the clerk's files of the court's opinion with reference to the allowance of costs and disbursements in favor of all parties against the estate of the decedent other than the mandate aforesaid. The appellants had no knowledge of the court's action excepting through the mandate.

It is therefore ordered that our written opinion be amended by adding thereto the following: "Costs and disbursements are hereby awarded to all the parties against the estate of Elise Rosenberg, deceased."

The appellants are permitted to file the cost bill as tendered, the mandate will be recalled and the clerk directed to enter therein the amount of the costs and disbursements of appellants.