John D. Bennett, J.
While the objections in this nonjury probate contest raise the standard issues of due execution, testamentary capacity, fraud and undue influence, the primary emphasis has been directed to fraud and undue influence and, more particularly, as .they relate to that portion of the ¡will which names the two attorney-draftsmen executors of the will. The third named executor, a layman friend of1 the decedent, has renounced his appointment. ;
The evidence adduced establishes that the will of July 23, 1970 was properly executed and that at the time of its execution the decedent possessed testamentary capacity, although more will be .said later of the decedent’s weakened physical and mental condition as it bears on the remaining issues of fraud and undue influence.- -The charge that the attorney-draftsmen, a father and son partnership, exercised fraud and undue influence on the testator in securing their nomination as executors appears to be a novel question in New .York.
■Oases where the draftsman or a close member of his family is an actual beneficiary under the will are of fairly frequent occurrence and in such situations an inference of undue influence may ¡be drawn if no explanation is made (Matter of Putnam, 257 N. Y. 140). In such cases, the draftsman or his close relative is benefited by a testamentary disposition under the will rather than merely named as an executor which essentially involves an office imposing serious duties. Nevertheless, the office does carry with it monetary benefits in the form of statutory commissions and, in this case, the right to select one’s self as attorney with resultant legal fees.
The question, while probably novel in,. New York, is not unheard of elsewhere. In Compher v. Browning (219 Ill. 429, 438) the court stated: “ The facts, that a confidential agent of a testator or -testatrix has drawn the will, or procured it to be drawn, and has been made executor and trustee thereunder, may *184 be suspicious circumstances, which call for additional scrutiny as to the fairness of ¡the transaction; but these facts alone do not invalidate the will where all the other circumstances, developed by the evidence, show that there was no fraud, or imposition, or attempt to exercise undue influence.” (Citing Schouler, Wills [2d ed.], § 245.) Indeed, our own Court of Appeals, in Coffin v. Coffin (23 N. Y. 9, 13), observed: “ Facts of this kind may, ¡and do often, very justly excite the suspicion of courts, when fraud and undue influence are alleged. But it is not a rule or principle in the law of testaments that the draftsman of a will cannot be an executor, or cannot take a benefit •under it.”.
While the quotation in the Compher case refers to an invalidation of the will, it is clear that the naming of executors is not an essential requisite of a will and, if procured by fraud or under undue influence, that portion alone of the will may be rejected as invalid, leaving the balance of the'will intact (Matter of Finn, 1 Misc. 280, 282; Wombacher v. Barthelme, 194 Ill. 425).
Fraud and undue influence are terms sometimes used interchangeably. While they may normally be spoken of seemingly in the same breath and with like meaning, there are technical differences. When fraud is exercised, the testator acts as a free agent, but is deceived into acting by false data. When undue influence is practiced, the mind (of the testator is overpowered so that the will of another is substituted for his own (94 C. J. S., Wills, § 221, p. 1060). While the former may be present without the latter, both are equally destructive of the will or that portion of the will affected.
Generally, fraud involves willful misrepresentation and an actual deception of the testator (Matter of Beneway, 272 App. Div. 463). However, fraud may also consist of concealment of facts or misrepresentations, even innocently made, where a confidential relationship exists between the testator and the beneficiary as in the attorney-client relationship (Wood v. Amory, 105 N. Y. 278; Illinois State Trust Co. v. Conaty, 104 F. Supp. 729; Matter of Rosenberg v. Struve, 196 Ore. 219; 1 Bowe-Parker : Page, Wills, § 14.2; 94 C. J. S., Wills, § 222).
A review of the evidence of discussions had by the attorney-draftsmen with the testator, although showing no actual intent to deceive, leaves no doubt that they were named as executors as-the result of at least constructive fraud (Matter of Di Crocco, 170 Misc. 826; Greenfield v. Greenfield, 123 N. Y. S. 2d 19; 1 Story, Equity Jurisprudence, § 258).
*185 A pritar will of the testator, dated August 3, 1963, together with its codicil of May 1, 1964, had named a bank as fiduciary and Mr. Usdan, the testator’s son-in-law, testified that one of the primary reasons for a change in the will was to eliminate the corporate fiduciary and name a family member instead in order to avoid the expense of commissions. Both attorneys agree with Mr. Usdan to the extent that one of the primary reasons for the new will was to change fiduciaries and his statement that it was to save commissions is uncontroverted.
The younger attorney, the son, testified: “ And Mr. Weinstock said — I don’t know whether he said that but he — we discussed — whether he prompted it or we did — no, I think he did. He asked us how many [executors] do you have and we explained to him what happens if you have one or what happens if you have two, what happens if you have more, and then he expressed the desire to have a plurality of executors, more than one and more than two, because we had explained to him the problems involved in two, and we arrived upon the figure of three.” (Emphasis supplied.)
When he was asked for the reasons why one would want three executors (which is the reason ostensibly he gave the testator), his answer is revealing: “You would want more than one executor of course in case of the death or incapacity or disappearance of an executor, so that would leave you the alternative of two, ibut then if you have two executors and there’s a dispute amongst them, you have a standoff and no majority rule, so we automatically go into three, and that’s how we end up with three here. ’ ’
The senior attorney’s testimony from a deposition read into the record and acquiesced in by the son is as follows:
“ Q Did the decedent tell you why he wanted the executors changed?1
“ A He told me he did not wish the .bank to be an executor, and when I asked him whom he wished to name as his executors he asked me for the duties of executors and when I explained the duties of executors to him and told him that we had to name executors he said, ‘ Mr. Ernest Canfield, my old friend, my good friend, and you, my attorneys. ’ ” (Emphasis supplied.)
All references to executors were made in terms of multiple executors. Implicit in the conversations had with the testator is the false representation that more than one executor was needed, “ a plurality ”. Conversely, there was a failure to disclose that a single executor would suffice with the addition of others as successor or alternate executors, especially since the *186 court is convinced that the testator wished to eliminate commissions instead of increase them. In addition, the son admittedly failed to disclose the important fact that, because the estate exceeded $100,000, each of the three named executors would be entitled to a full commission (SCPA 2307). In this regard, it appears of more than passing significance that the only question the senior attorney asked the testator as ito the extent of his estate was whether it was “ in excess of $100,000.”
There is even a hint of possible suggestions as to executors in a portion of the son’s testimony: “ we explained to him about trustees and he gave us some names, or we gave Mm names, we made suggestions, I’m not sure, and he chose trustees and he then chose executors.” (Emphasis supplied.) While it is conceivable that the suggestions were made only as to trustees who are persons other than the attorneys, the quotation is ambiguous enough to infer that suggestions may also have been made as to names of executors.
Moreover, the sum total of misleading advice and suppression of facts is compounded here by the testator’s physical and mental condition. He was an elderly man with physical infirmities whose mental acuities were waning. He had become forgetful, eccentric, irascible, impatient and exhibited behavior seemingly odd to his family: Upon the advice of his long-time friend and stockbroker, the decedent discontinued his trading of securities on the stock market during late 1968 and early 1969 because of his forgetfulness. In the first half of 1970 and before changing his will, the decedent entered the hospital twice for physical ailments. The decedent was not a native American and was unable to read or write more than simple English nor was he readily able to dial telephone numbers and use the telephone in a normal fashion.
Finally, the question of credibility is important. The testimony of the attorney-draftsmen, which differs in a number of material instances from that of Mr. Usdan, is in the opinion of the court less credible. For instance, the younger attorney stated that, while he used the prior will of 1963 as a guide, he consulted at least 30 other wills as forms. Since the later will of July 23,1970 is for the most part a carbon copy of the prior will, even to the repetition of typographical errors, the testimony that the younger attorney consulted 30 other wills seems incredulous. Again, he stated that one of the reasons for making a new will was to change the power of appointment because of a change in the law relating to the marital deduction “ since 1963 or 1964, and there was some modifications.” However, both wills *187 contain exactly the same unchanged language relating to the widow’s power of appointment.
The petition includes not only a request for admission of the will of July 23, 1970 to probate but also a codicil of August 28, 1970 which solely adds a bequest of $15,000 for the decedent’s only granddaughter. The proof fails to establish due execution of this codicil. It was purportedly executed by the testator at home and two housekeepers acted as witnesses, one testifying that the document was folded so that only the place for her signature was visible-#nd the nature of the document was never revealed to her. Under the circumstances, probate of the codicil of August 28,1970 is denied (Matter of Pulvermacher, 305 N. Y. 378). However, this was not the only codicil by which the testator sought to effectuate this bequest for his granddaughter. At least two other attempts were made. In each case, the attorney mailed the codicil to the testator and failed to personally supervise its execution. The two prior codicils (one dated July 27, 1970 and the other August 10, 1970), one of which is admittedly defective in that it contains only one witness’s signature, were not offered for probate.
The will of July 23,1970 is admitted to probate with the exception of that portion of article bight which names the attorneys as coexecutors, which portion of the will is declared invalid. Preliminary letters issued to the two named attorneys are revoked and they are directed to turn over all assets in their possession to the successor fiduciary to be appointed. Since the testator’s daughter is the residuary beneficiary, she is entitled to letters of administration c. t. a. and will be appointed upon qualifying according to law. The preliminary executors are directed to file their account within 30 days from the date hereof and proceed to judicially settle it.
Since the testator evinced a strong intention to benefit his only granddaughter and two of the three codicils were never offered for probate, a conference is directed to be held at this court on Tuesday, June 4,1974 at 10:00 a.m., solely in connection with this bequest.